# In re ULTRAFEM INC. SECURITIES LITIGATION.

## No. 98 Civ.1900(LAP).

United States District Court,
S.D. New York.

April 6, 2000.

---

Arthur N. Abbey, Jill S. Abrams, Nancy Kaboolian, Abbey, Gardy & Squitieri, LLP, New York, New York, Samuel P. Sporn, Joel P. Laitman, Jay P. Saltzman, Schoengold & Sporn, P.C., New York, New York, for Plaintiffs.

Conrad K. Harper, Paul C. Curnin, Edward D. Hassi, Peter E. Kazanoff, Simpson Thacher & Bartlett, New York, New York, for Defendants Andersen, Reap, Hinch, Peebler, Nordmann, Cone, Jones, Nussbaum, Guthrie and Zesiger.

Robert I. Bodian, John M. O'Connell, O'Sullivan Graev & Karabell, LLP, New York, New York, for Defendant Contente.

Lisa Klein Wager, Rachelle M. Barstow, Morgan Lewis & Bockius LLP, New York, New York, for Defendant Jefferies & Company, Inc.

Michael J. Dell, Kramer Levin Naftalis & Frankel LLP, New York, New York, for Defendant Hampshire Securities Corporation.

## OPINION

PRESKA, District Judge.

Plaintiffs John Magnan, Philip Berliner, Gershon Sontag, Tiffany Lewin, Jaqulin Shere and Rose Shere, on behalf of a putative class of similarly situated investors (collectively, "plaintiffs"), filed this securities action alleging that they were injured by the acts of defendants in violation

of sections 11, 12(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k(a) ("Section 11"), 15 U.S.C. § 77*l* ("Section 12(2)"), 15 U.S.C. § 77*o* ("Section 15") and sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"), Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission (the "SEC"), 17 C.F.R. § 240.10b–5 ("Rule 10b–5") and section 20(a) of the Exchange Act, 15 U.S.C. § 78t ("Section 20(a)").

Defendants move to dismiss the complaint on varied grounds, including failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, Fed. R. Civ. Proc. 12(b)(6) ("Rule 12(b)(6)"), failure to plead fraud with particularity under Rule 9(b) of the Federal Rules of Civil Procedure, Fed. R. Civ. Proc. 9(b) ("Rule 9(b)"), and failure to set forth a short and plain statement showing that the plaintiffs are entitled to relief under Rule 8(a) of the Federal Rules of Civil Procedure, Fed. R. Civ. Proc. 8(a) ("Rule 8(a)"). For the reasons stated below, defendants' motions are granted.[1]

## BACKGROUND

### I. Factual Background and Plaintiffs' Allegations.

Ultrafem®, Inc. ("Ultrafem") was formed to design, develop and manufacture products, based upon its proprietary and patented SoftCup® Technology (the "SoftCup Technology"), to address women's health care needs. (Compl.¶ 40.)[2] The SoftCup Technology was described as a physical barrier-type vaginal device designed to enhance the comfort, functionality and effectiveness of products designed for women in the areas of feminine protection, contraception, the prevention of sexually transmitted diseases and the treatment of vaginal infections. (*Id.* ¶ 40.) Using the SoftCup Technology, Ultrafem manufactured INSTEAD TM ("INSTEAD"), a disposable menstrual fluid collection product. (*Id.* ¶ 2.)

Effective November 13, 1996, defendants made a $40 million Ultrafem common stock offering of two million shares at $20.00 per share (the "Offering"). (*Id.* ¶ 1.) Plaintiffs allege that defendants made various material misstatements and omissions in the November 13, 1996 prospectus,

1. The following submissions have been considered in resolving this motion in addition to the notices of motion of the various defendants: Affidavit of Paul C. Curnin in Support of Individual Defendants' Motion to Dismiss, sworn to Feb. 24, 1999 ("Curnin Aff."); Memorandum of Law of the Individual Defendants in Support of Their Motion to Dismiss the Complaint with Prejudice, dated Feb. 24, 1999 ("Ind.Defs.Mem."); Memorandum of Law of Audrey Contente in Support of Her Motion to Dismiss the Complaint with Prejudice ("Contente Mem."); Declaration of Rachelle M. Barstow in Support of Jefferies' Motion to Dismiss, dated June 30, 1999 ("Barstow Decl ."); Memorandum of Law in Support of Defendant Jefferies & Company, Inc.'s Motion to Dismiss the Complaint with Prejudice, dated Mar. 19, 1999 ("Jefferies Mem."); Declaration of Michael J. Dell in Support of Hampshire's Motion to Dismiss, sworn to Feb. 23, 1999 ("Dell Decl."); Memorandum in Support of Defendant Hampshire Securities Corporation's Motion to Dismiss the Complaint with Prejudice, dated Feb. 24, 1999 ("Hampshire Mem."); Plaintiffs' Memo-

randum of Law in Response to Defendants' Motions to Dismiss, dated Apr. 30, 1999 ("Pl. Mem."); Reply Memorandum of Law of the Individual Defendants in Support of Their Motion to Dismiss the Complaint with Prejudice, dated June 30, 1999 ("Ind. Defs. Reply Mem."); Reply Memorandum of Law of Audrey Contente in Support of Her Motion to Dismiss the Complaint with Prejudice, dated June 30, 1999 ("Contente Reply Mem."); Reply Memorandum of Law in Further Support of Defendant Jefferies & Company, Inc.'s Motion to Dismiss the First Consolidated and Amended Complaint with Prejudice, dated June 30, 1999 ("Jefferies Reply Mem."); Reply Memorandum in Support of Defendant Hampshire Securities Corporation's Motion to Dismiss the Complaint with Prejudice, dated Feb. 24, 1999 ("Hampshire Reply Mem."); and other submissions referenced in the above-listed documents.

2. Cites to "Compl." refer to the First Consolidated and Amended Complaint, dated Oct. 28, 1998.

(Curnin Aff. Ex. B (the "Prospectus")), and in public statements in connection with said Offering and subsequent to the Offering in SEC filings and public statements. (Compl.¶ 1.) Plaintiffs are those persons who purchased or otherwise acquired Ultrafem shares between November 13, 1996 and February 13, 1998 (the "Class Period"). (*Id.*) Defendants John W. Andersen ("Andersen"),[3] Dori M. Reap ("Reap"), Tonya G. Hinch ("Hinch"), Charles D. Peebler ("Peebler"), Gary Nordmann ("Nordmann"), Richard A. Cone ("Cone"), Joy Vida Jones ("Jones"), Martin Nussbaum ("Nussbaum"), Wendell Guthrie ("Guthrie"), Barrie R. Zesiger ("Zesiger") (collectively, the "Individual Defendants"), former officers and/or directors of the now bankrupt Ultrafem, move to dismiss the Complaint for failure to plead fraud with particularity and failure to state a claim under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, respectively. Defendant Audrey Contente ("Contente"), a former officer and director of Ultrafem, moves to dismiss the Complaint for failure to state a claim under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.[4] Defendants Jefferies & Company, Inc. ("Jefferies") and Hampshire Secu-

rities Corporation ("Hampshire"), co-lead underwriters of the Offering of Ultrafem securities in November 1996, (collectively, the "Underwriter Defendants"), also move to dismiss the Complaint. Jefferies moves to dismiss for failure to plead fraud with particularity and failure to state a claim under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, respectively.[5] Hampshire moves to dismiss on the same grounds and also for failure to set forth a short and plain statement showing that the plaintiffs are entitled to relief under Rule 8(a) of the Federal Rules of Civil Procedure.

### A. Statements In Connection with the Offering

On November 13, 1996, two million shares of Ultrafem common stock at $20 per share were offered pursuant to a prospectus and registration statement (the "Registration Statement"). The alleged misstatements and omissions made prior to and in the Offering are as follows.

### 1. Consumer Use Testing

The Prospectus [6] states under a heading "Consumer Use Testing":

> (*Id.* ¶ 25.) Zesiger was a Director of Ultrafem and a beneficial owner of 1,681,359 shares of Ultrafem common stock. (*Id.* ¶ 26.) On or about November 17, 1997, Zesiger sold 40,000 shares. (*Id.*)

---

3. During the relevant time period, the Individual Defendants' positions were as follows: Andersen was the Chairman of the Board of Directors, Chief Executive Officer and President of Ultrafem. (Compl.¶ 16.) Contente was the founder of Ultrafem, the inventor of the SoftCup Technology and a Director of Ultrafem. (*Id.* ¶ 17.) Reap was the Senior Vice President of Finance and Administration and Chief Financial Officer of Ultrafem. (*Id.* ¶ 18.) Hinch was Ultrafem's Senior Vice President of Marketing and Sales. (*Id.* ¶ 19.) Peebler was a Director of Ultrafem and the President, Chief Executive Officer and a Director of Bozell, Jacobs, Kenyon & Eckhardt, Inc. ("BJK & E") (*Id.* ¶ 20.) Bozell, a wholly-owned subsidiary of BJK & E, was retained and paid by Ultrafem to assist in marketing, advertising and creative work for Ultrafem. (*Id.*) Nordmann was Vice President of Operations for Ultrafem. (*Id.* ¶ 21.) Cone was a Director of Ultrafem and the beneficial owner of 20,000 shares of Ultrafem common stock. (*Id.* ¶ 22.) Jones and Nussbaum were Directors of Ultrafem. (*Id.* ¶¶ 23–24.) Guthrie was Director of Manufacturing for Ultrafem.

4. While Contente's Notice of Motion states that she moves to dismiss under Rule 12(b)(6) only, her memorandum of law adopts the memorandum of law of the Individual Defendants which argues for dismissal under Rule 9(b). Therefore, I construe Contente's motion to dismiss under Rules 9(b) and 12(b)(6).

5. Jefferies also makes arguments under Rule 8 of the Federal Rules of Civil Procedure although Rule 8 is not designated in Jefferies' Notice of Motion.

6. On a motion to dismiss, I may consider documents incorporated by reference in the complaint and publicly available documents filed with the SEC. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir.1996).

During the nine-month period of November 1991 through July 1992, [INSTEAD] was use tested among a total of 300 women, ages 18–55, at seven different geographical locations in the United States. . . .

The research concluded that approximately 80% of the women were interested in continuing to use [INSTEAD], with approximately 54% of the women indicating they would be likely to use [INSTEAD] as their primary method of feminine protection in the future.

(Prospectus, at 33.)

With respect to this statement, plaintiffs contend:

(1) Defendants failed to disclose the existence or results of a clinical trial of INSTEAD's safety and efficacy (the "Clinical Trial") that was conducted in addition to the consumer use test. (Compl.¶ 41–43.)

(2) Defendants failed to disclose that the results of the Clinical Trial were never analyzed. (*Id.* ¶ 47.)

(3) Defendants failed to disclose that Dr. Barbara North resigned as principal investigator of the Clinical Trial because of Ultrafem's refusal to analyze the data collected from the Clinical Trial. (*Id.* ¶ 43.)

(4) Defendants failed to disclose the methodology used to translate the study participants' questionnaire answers into determinations of the likelihood of participants to continue to use INSTEAD (the 80% figure) or to use INSTEAD as their primary method of protection (the 54% figure). (*Id.* ¶¶ 43–44.)

(5) Defendants failed to disclose Dr. North's advisements "of disturbing trends which became apparent from Dr. North's data regarding instances of cramping and leaking" among INSTEAD Clinical Trial participants. (*Id.* ¶ 45.)

Thus, I have considered the Prospectus, (Curnin Aff. Ex. B), in resolving this motion.

## 2. Design and Performance of IN-STEAD

The Prospectus also states:

The Company [7] believes that the unique design of [INSTEAD] provides several distinct benefits over currently available forms of feminine protection, including increased comfort, improved performance, reduced health concerns and freedom to engage in most physical (including sexual) activities during menstruation.

(Prospectus, at 3, 27.)

The commercial products which will employ the SoftCup Technology will be disposable, single use, universal size and made from a soft, inert thermoplastic material which becomes more pliable at body temperature and molds to fit the individual user's anatomy.

(Prospectus, at 27.)

Plaintiffs contend the statements regarding INSTEAD's "fit" were false and misleading because: (1) thermoplastic construction related only to the manufacture of INSTEAD and not its fit once inside the user and (2) prior to the issuance of the Prospectus, Ultrafem's scientific advisory board had informed defendant Contente that INSTEAD could not comfortably fit all women. (*Id.* ¶ 49.) Plaintiffs also allege that Ultrafem's scientific advisory board advised defendant Contente that INSTEAD "did not provide 'improved performance' because leakage remained a problem with INSTEAD, as it was with other forms of feminine protection." (*Id.*) Allegedly, Dr. North had advised Contente that data "revealed numerous instances of cramping and leakage experienced by women" who used INSTEAD. (*Id.*)

## 3. Financial Condition

With respect to Ultrafem's financial condition and outlook, the Prospectus stated in a section entitled "RISK FACTORS"

7. References to "Company" are references to Ultrafem. (Prospectus, at 3.)

under a heading "Need for Additional Financing for Unforeseen Risks":

> The Company believes that the level of financial resources available to it is an important factor in its ability to achieve the marketing and distribution of [INSTEAD] and in its ability to develop and eventually bring medical products to market. Management believes that the financial resources available to it, together with the net proceeds of the Offering, will satisfy the Company's working capital needs for at least 12 months. However, the Company may require additional financing if unforeseen risks are encountered. If the Company is unable to raise additional capital or arrange satisfactory working capital or additional equity financing, the Company may be unable to complete the distribution of [INSTEAD] into the full United States market. Additional financings may require the issuance of new equity securities, and there can be no assurance that the Company will be able to obtain working capital or additional financing at a favorable rate, if at all.

(Prospectus, at 9.)

Plaintiffs contend this statement was false and misleading because prior to and during the Class Period, Ultrafem used a business plan drafted by Contente (the "Business Plan") which contained assumptions regarding the number of cups used per month per woman, the number of times each cup would be used and pricing based on the number of cups each woman was projected to use. (Compl.¶ 51(a).) Plaintiffs contend that internal Ultrafem reports indicated that the average woman used only 9 to 10 cups per month, rather than the 18 to 24 cups projected by the Business Plan. (*Id.*) Furthermore, plaintiffs contend that although INSTEAD was marketed as a "single use" product, women reused INSTEAD, thus reducing the number of cups per month used. (*Id.* ¶ 51(b).) The decrease in cup usage, plain-tiffs allege, resulted in Ultrafem's inability to follow the pricing structure set forth in the Business Plan. (*Id.* ¶ 51(c).) Plaintiffs claim that the decreased sales from the lesser usage resulted in the need for cash and expensive advertising and that at the time the Prospectus was issued, Ultrafem required additional financing and such financing was not "unforeseen." (*Id.* ¶ 51(d).)

### 4. Uniqueness of INSTEAD

Finally, plaintiffs take issue with the following statements in the Prospectus:

> Management believes that [INSTEAD] represents one of the most significant technological developments for feminine protection since the introduction of the first commercial disposable tampon in 1933. [INSTEAD] differs from other forms of feminine protection currently on the market in that it collects, rather than absorbs, menstrual fluid.

(Prospectus, at 3, 27.)

A September 16, 1996 press release also stated that INSTEAD was " 'the first feminine protection product to provide a true alternative to tampons and pads in 60 years[.]' " (Compl. ¶ 52 n. 1 .)

Plaintiffs contend that defendants failed to disclose "that cup-like feminine hygiene devices had been developed since the 1930s, but had never successfully garnered more than a very small niche share of the feminine protection market," (*id.* ¶ 53), and that "INSTEAD was not a new technology and that its prospects for mass acceptance posed an extreme risk," (*id.* ¶ 56(e).) Plaintiffs also allege that Ultrafem representatives received information regarding the other menstrual cup-like devices from Harry Finley, "a recognized resource of information on menstruation and menstrual devices." (*Id.* ¶ 55.)

### B. *Post–Offering Statements* [8]

On November 20, 1996, Bloomberg News published an article discussing the

---

**8.** Claims relating to post-Offering statements are alleged against the Individual Defendants

failure of prior menstrual fluid collection devices and quoted Dr. North as saying she could not "remember" the positive consumer usage data cited in the Prospectus. (Curnin Aff. Ex. D.) Also, statements regarding the significance of the technological development of INSTEAD and the increased comfort and performance of IN-STEAD were allegedly repeated in Ultrafem's Form 10–K. (*Id.* ¶¶ 72–74.)

According to the Complaint, Ultrafem's December 31, 1996 Form 10–Q states:

> The Company believes that the level of financial resources available to it is an important factor in its ability to achieve the marketing and distribution of [IN-STEAD] and in its ability to develop and eventually bring medical products to market. The Company's need for funds has increased from period to period as it has incurred expenses for, among other things, the manufacturing, marketing and distribution of [IN-STEAD], research and development activities, engineering and design of fully automated manufacturing systems, clinical testing, meeting domestic and international regulatory requirements, applications for domestic and international patent protection, applications for domestic trademark protection and market research. The Company may require additional financing if unforeseen risks are encountered. If the Company is unable to raise additional capital or arrange satisfactory working capital or additional equity financing, the Company may be unable to complete the distribution of [INSTEAD] into the full United States market. Additional financing may require the issuance of new equity securities, and there can be no assurance that the Company will be able to obtain working capital or additional financing at a favorable rate, if at all.

(Compl.¶ 57.) Plaintiffs claim these Form 10–Q statements were repeated in substantially the same form in other post-Offering SEC filings, (*id.*), and that such statements were false and misleading because the defendants knew of the Business Plan, (*id.* at ¶ 58.)

The Complaint also contains allegations that Ultrafem and certain officers and directors made false statements regarding INSTEAD's sales and distribution. (*Id.* ¶¶ 59–77.) On January 31, 1997, Ultrafem's stock price was $15.50 per share. (*Id.* ¶ 61.) On February 3, 1997, Ultrafem allegedly announced that it had reached distribution agreements with certain stores. (*Id.* ¶ 60.) Andersen allegedly claimed that these agreements stemmed from "positive sales results" and "strong consumer demand" for INSTEAD. (*Id.* ¶ 61.) On February 3, 1997, Ultrafem's common stock price was $19.25 per share. (*Id.*) On June 5, 1997, Ultrafem's stock price was $14.50 per share. (*Id.* ¶ 66.) On or about June 6, 1997, Ultrafem announced agreements with other stores and announced that it expected the product to generate positive sales results for the retailers. (*Id.*) On June 6, 1997, Ultrafem's stock closed at $16 per share. (*Id.*) Plaintiffs claim that INSTEAD distribution agreements contemplated sales at large discounts and/or sales with a right of return that should not have been recognized under Generally Accepted Accounting Principles ("GAAP"). (*Id.* ¶¶ 77–83.) In support of their claim, plaintiffs quote from financial statements in Ultrafem's Form 10–K for the year ended June 30, 1997 which state "revenue was recognized upon shipment of the merchandize [sic]." (*Id.* ¶ 80 .) During the distribution period, Ultrafem continued to incur operating losses. (*Id.* 65–68.)

Furthermore, defendants allegedly failed to disclose that Ultrafem was in need of $50 million in order to continue to manufacture and sell its product beyond 1998 pursuant to its Business Plan. (*Id.* ¶ 86.) According to the Complaint, in its Form 10–K filed with the SEC for the year ended June 30, 1997, Ultrafem stated:

and Contente only.

The Company believes that the financial resources available to it is an important factor in its ability to achieve the marketing and important factor in its ability to achieve the marketing [sic] and distribution of [INSTEAD] and in its ability to develop and eventually bring women's health care products to market. The Company's need for funds has increased from period to period.... The Company may require additional financing if unforeseen risks are encountered. The Company is currently seeking to raise up to $50 million in a private placement.... Additional financing may require the issuance of new equipment [sic] securities, and there can be no assurance that the Company will be able to obtain working capital or additional financing at a favorable rate, if at all.

(*Id.* ¶ 86 (emphasis added).) Efforts to obtain additional financing through the private placement were unsuccessful. (*Id.* ¶¶ 92–93.)

In February 1998, Jefferies issued a report stating that Ultrafem had $2.1 million in cash and was in a critical cash position. (*Id.* ¶ 92.) On February 13, 1998, Ultrafem common stock closed at $1.375 per share. (*Id.*) In April 1998, Ultrafem filed for Chapter 11 protection under federal bankruptcy law. (*Id.* ¶ 93.) At that time, Ultrafem's stock was trading at less than $.25 per share. (*Id.*)

The Complaint states that the employment agreements of defendants Andersen, Reap and Hinch provided for increases in base salaries upon the introduction of INSTEAD to at least five percent of the United States market. (*Id.* ¶¶ 94, 96, 97.) Contente was also entitled to the same base salary increase. (*Id.* ¶ 95.) Andersen and Contente were also allegedly entitled to royalties based on the number of INSTEAD units and other SoftCup Technology products sold. (*Id.* ¶¶ 94–95.) Andersen, Reap and Hinch allegedly received stock options exercisable upon the distribution of INSTEAD to 50% of the public

in the United States and Europe. (*Id.* ¶¶ 94, 96, 97.)

Defendant Zesiger allegedly sold 40,000 shares of Ultrafem on or about November 17, 1997 at $3.64 per share while possessing material adverse information. (*Id.* ¶ 98.)

Defendant Peebler is alleged to have known of the prior history and failures of menstrual cup devices through his position with Bozell, a communications company retained and paid by Ultrafem. (*Id.* ¶¶ 100–02.) Bozell employees purportedly met with Harry Finley, a "recognized resource of information on menstruation and menstrual devices," who informed them of the lack of acceptance of menstrual cup devices in the United States. (*Id.* ¶¶ 55–56, 101–02.)

The Underwriter Defendants, according to plaintiffs, failed to investigate properly the trial performance and market acceptance of prior menstrual cup devices and the INSTEAD Clinical Trial results, thus, breaching their "due diligence" duties. (*Id.* ¶¶ 103–05.)

II. Procedural Background:

In March 1998, the first of many putative class action complaints pertaining to Ultrafem was filed. In August 1998, plaintiffs filed a consolidated class action complaint. Following an exchange of letters from defendants outlining alleged deficiencies in the consolidated complaint, plaintiffs filed the "First Consolidated and Amended Complaint" (the "Complaint") in November 1998 with the understanding that no further amendments would be permitted.

Plaintiffs have brought claims against all defendants for violations of Section 11, Section 12(2) and Section 15. In addition, plaintiffs seek to recover from the Individual Defendants and Contente for violations of Section 10(b), Rule 10b–5 and Section 20(a).

## DISCUSSION

### I. Legal Standards.

#### A. Rule 12(b)(6).

In deciding a motion to dismiss, I must view the complaint in the light most favorable to the plaintiff. *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir.1985). I must accept as true the factual allegations stated in the complaint, *Zinermon v. Burch*, 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), and draw all reasonable inferences in favor of the plaintiff, *see Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir.1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994). A motion to dismiss may be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

#### B. Rule 9(b).

■ Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. Proc. 9(b). " '[T]he complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). In addition to Rule 9(b), a plaintiff must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* 15 U.S.C. § 78u–4(b).

■ The parties dispute whether Rule 9(b) applies to claims under Section 11 and Section 12(2). The Court of Appeals has not decided this issue, and courts in this district disagree on the application of Rule 9(b). *See Griffin v. PaineWebber Inc.*, No. 99 Civ. 2292, 2000 WL 178180, at *4 (S.D.N.Y. Feb. 14, 2000). Those courts that have determined that Rule 9(b) is applicable to Section 11 and Section 12(2) have limited its application to cases where the complaint is grounded in fraud. *See, e.g., Griffin*, 2000 WL 178180, at *4; *Ellison v. American Image Motor Co.*, 36 F.Supp.2d 628, 639 (S.D.N.Y.1999); *Schoenhaut v. American Sensors, Inc.*, 986 F.Supp. 785, 795 (S.D.N.Y.1997). I find this reasoning persuasive and look to the allegations of the Complaint to determine whether plaintiffs' Securities Act claims sound in fraud.

■ With respect to the Individual Defendants and Contente, plaintiffs make little, if any, effort to differentiate their asserted negligence claims from the fraud claims which permeate the Complaint. Plaintiffs argue that their Section 11, Section 12(2) and Section 15 allegations, which incorporate certain paragraphs of the Complaint "except to the extent" any allegations in the cited paragraphs "sound in fraud," is sufficient to remove those allegations from the requirements of Rule 9(b). (*See* Compl. ¶¶ 106, 115, 123.) I disagree.

Plaintiffs charge the Individual Defendants and Contente with a fraudulent scheme designed to "continue and prolong a distorted and misleading appearance of Ultrafem's financial condition, internal controls, and business prospects, so that they could preserve their executive positions and the substantial compensation, benefits and prestige they obtained thereby." (Compl.¶ 27.) This theme is evident throughout the remaining allegations. By merely disavowing any allegations that would make Rule 9(b) applicable to Securities Act claims and without specifying the allegations that would support a negligence cause of action, plaintiffs essentially request that the Court parse their allegations to find a negligence claim. (*See id.* ¶¶ 106 ("Plaintiffs repeat and reallege paragraphs 1 through 56 above as if fully

set forth herein, except to the extent that any allegations contained above which may be interpreted to sound in fraud, which allegations are *not* incorporated in the present claim"), 115 (same with different paragraph citations), 123 (same with different paragraph citations).) Plaintiffs do not specify the basis for a negligence claim (*i.e.*, duty, breach, damage resulting proximately from breach, *see, e.g., Mechigian v. Art Capital Corp.*, 612 F.Supp. 1421, 1430 (S.D.N.Y.1985)), in the Complaint or in their opposition to defendants' motions to dismiss. Moreover, without ruling on their sufficiency, the allegations that are made here are classic fraud allegations, (*see, e.g.*, Compl. ¶¶ 27, 36), that is, allegations of misrepresentations and omissions made with intent to defraud upon which plaintiffs relied. *See, e.g., Benjamin v. Kim*, No. 95 Civ. 9597, 1999 WL 249706, at *15 (S .D.N.Y. Apr. 28, 1999). Thus, plaintiffs' boilerplate disclaimer is not enough to make out a claim for negligence, and, therefore, Rule 9(b) applies to the Section 11, Section 12(2) and Section 15 claims against the Individual Defendants. *See In re Stratosphere Corp. Sec. Litig.*, 89 F.3d 1399, 1404 n. 2 (9th Cir.1996) ("nominal efforts" to disclaim allegations of fraud with respect to section 11 claims do not preclude application of Rule 9(b) where gravamen of complaint is "plainly fraud"); *In re Stratosphere Sec. Litig.*, 1 F.Supp.2d 1096, 1104 (D.Nev.1998) ("Plaintiffs cannot avoid the more stringent requirements of Rule 9(b) by merely inserting boilerplate language into their complaint stating that claims are based in negligence not fraud").

■ In contrast to the conduct attributed to the Individual Defendants, plaintiffs do not contend that the Underwriter Defendants acted with fraudulent intent. Plaintiffs charge the Underwriter Defendants with failing to meet their due diligence duties. (*See* Compl. ¶¶ 103–105,

111, 117.) Nowhere do plaintiffs allege that Jefferies or Hampshire were involved in a fraudulent scheme. Thus, Rule 9(b) does not apply to the claims against the Underwriter Defendants. *See In re APAC Teleservice, Inc. Sec. Litig.*, No. 97 Civ. 9145, 1999 WL 1052004, at *10 (S.D.N.Y. Nov. 19, 1999) (allegations that underwriters did not exercise due diligence removed such allegations from penumbra of Rule 9(b)).

### C. Rule 8(a).

Rule 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). The purpose of this rule is "to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir.1988). An inadequately pleaded complaint "may be so baldly conclusory that it fails to give notice of the basic events and circumstances of which the plaintiff complaints." *Shuster v. Oppleman*, No. 96 Civ. 1689, 1999 WL 9845, at *3 (S.D.N.Y. Jan. 11, 1999).

### ANALYSIS

#### I. Statute of Limitations.

■ The Individual Defendants and Contente assert that plaintiffs' "consumer use testing" and "product design" claims are time-barred in light of publicly available information cited in the Complaint. (Ind. Defs. Mem. at 6.) Hampshire contends that all of plaintiffs' claims are time-barred.[9] (Hampshire Mem. at 41.) This public information was allegedly available in the patent for SoftCup Technology annexed to the Registration Statement (the "Patent"), (*see* Compl. ¶ 54), and a Bloomberg News article dated November 20, 1996, (*see* Curnin Aff. Ex. D; Compl. ¶ 46.)

---

**9.** While defendant Jefferies does not raise a statute of limitations defense, I may dismiss claims against Jefferies *sua sponte* on statute of limitations grounds if the facts supporting that defense are set forth in the Complaint. *See Leonhard v. United States*, 633 F.2d 599, 609 n. 11 (2d Cir.1980).

■ Federal securities claims must be commenced within "one year after the discovery of the facts constituting the violation." 15 U.S.C. § 77m; 15 U.S.C. § 78i(e). Discovery "includes constructive and inquiry notice as well as actual notice." *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir.1993).

The November 20, 1996 Bloomberg News article, cited in the Complaint, states that the consumer use study, which showed that 80% of women trying IN-STEAD would use it again, "was never published" and that Dr. North has no memory of such positive results. (Curnin Aff. Ex. D.) Dr. North is quoted as saying, " 'I can't say it's wrong, but I don't know where they got that number.' " (*Id.*) The article also discusses the failure of the same prior menstrual fluid collection products identified by plaintiffs as an omission and notes that "the failure of predecessor products goes unmentioned in Ultrafem's prospectus." (*Id.*)

The article also notes the existence of an SEC "informal inquiry" and concludes, "[b]ut whether Ultrafem can reverse three-and-a-half decades of women rejecting the product is yet to be seen. There's a reason women haven's switched in droves to the menstrual cup. And that reason isn't because it's so tidy to use." (*Id.*) The Individual Defendants contend that the November 20, 1996 Bloomberg News article bars plaintiffs' claims regarding the nondisclosure of the Clinical Trial results, the failure of prior menstrual cup devices and the statement that 80% of the women in the consumer use study would like to continue to use INSTEAD.

■ Knowledge of a fraudulent scheme will be imputed to an investor of ordinary intelligence who does not make an inquiry when circumstances suggest to such an investor the probability of fraud. *See Salinger v. Projectavision, Inc.*, 972 F.Supp. 222, 229 (S.D.N.Y.1997). Dismiss-

al is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures themselves. *Id.* "Plaintiffs need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them." *Id.*

■ I agree that claims relating to the nondisclosure of failures of other menstrual cup devices, including claims regarding the significance, improved performance and increased comfort of INSTEAD, are time-barred because the Bloomberg News article placed plaintiffs on inquiry notice.[10] The article includes under the heading "New Concept?" a discussion of prior devices, their failures and the fact that such failures were not mentioned in the Prospectus. (Curnin Aff. Ex. D.) Thus, the article was sufficient to put plaintiffs on notice of the probability of fraud. *See Salinger*, 972 F.Supp. at 229. Indeed, the omission of such information in the Offering is the essence of one of plaintiffs' claims. Defendants' position is further buttressed by the inclusion of Ultrafem's Patent in the Registration Statement, which contained a thorough discussion of prior patented menstrual cup devices and their inadequacies. (*See* Curnin Aff. Ex. C.)

Similarly, the Bloomberg News article placed plaintiffs on inquiry notice that the Clinical Trial (apart from the consumer use study) existed. Plaintiffs contend that Ultrafem conducted two trials: a safety and efficacy trial (the Clinical Trial) and a consumer use trial (also referred to as a consumer use study). The Bloomberg News article refers to a "1991 clinical trial" cited in Ultrafem's Prospectus "in which 300 women tried INSTEAD, with 80% saying they'd use it again" and states that "the study ... was never published." (Curnin Aff. Ex. D.) Although the article does not distinguish between the safety and efficacy trial and the consumer use

---

**10.** I note that plaintiffs do not argue that the existence of a single publicly available article

is insufficient to put plaintiffs on inquiry notice.

study, it clearly states that certain clinical trial data was never published—precisely plaintiffs' claim here. In addition, the Bloomberg News article reports Dr. North's lack of memory as to any "results that would show 80% of the sample wanted to continue using INSTEAD." (*Id.*) This latter statement alone is sufficient to put readers on notice that there might be problems with test data. The two statements together constitute more than sufficient "storm warnings," *see Addeo v. Braver*, 956 F.Supp. 443, 449 (S.D.N.Y.1997) ("Once such 'storm warnings' appear, plaintiffs must exhibit 'reasonable diligence' in investigating the possibility that they have been defrauded"), to these plaintiffs about undisclosed tests—albeit not in the detail that is now asserted, but "notice of the entire fraud" is not required. *E.g., Dodds*, 12 F.3d at 352.

The article's discussion of Dr. North's lack of memory regarding the Prospectus' statement that 80% of the women in the consumer use test want to continue to use INSTEAD is also problematic to the plaintiffs' claims that the defendants failed to disclose the methodology used to translate the study participants' questionnaire answers into determinations of the likelihood of participants to continue to use INSTEAD or to use INSTEAD as their primary method of protection. (Compl.¶¶ 43–44.) Dr. North's quote, "I can't say it's wrong, but I don't know where they got that number," is, in substance, the crux of plaintiffs' allegation. Plaintiffs do not claim that the 80% figure is wrong *per se* but that it is a matter of interpretation of questionnaire results. The fact that the principal investigator of the study also questions the derivation of the 80% figure was a "storm warning" obligating plaintiffs to exercise reasonable diligence in investigating the possibility that they have been defrauded. *See Addeo*, 956 F.Supp. at 449. Thus, I find plaintiffs' claims regarding the failure to disclose questionnaire answers to be time-barred.

The article also quotes Dr. North as saying that INSTEAD "is 'one size fits all,' which means 'it won't fit everyone,' but is fine for most women." (Curnin Aff. Ex. D.) Plaintiffs do not address this portion of the article in their brief. However, plaintiffs contend in their Complaint that "INSTEAD could not comfortably fit all women," (Compl.¶ 49), and that the statement that INSTEAD " 'molds to fit the individual user's anatomy' " was materially false and misleading, (*id.*). I agree with defendants that this statement was enough to put plaintiffs on inquiry notice that INSTEAD could not comfortably fit all women or mold to fit every user. Thus, this claim is time-barred.

In sum, I find that claims regarding the Clinical Trial, consumer use study, performance, comfort and significance of INSTEAD are time-barred. My holding with respect to the statute of limitations is limited to these specific allegations. I find defendants' statute of limitations arguments relating to the remainder of the allegations unavailing.

## II. Standing.

The Underwriter Defendants contend that plaintiffs have no standing to assert Section 11 and Section 12(2) claims because none of the plaintiffs claim to have purchased Ultrafem securities in the Offering. Plaintiffs Berliner and Lewin purchased shares of Ultrafem in the "aftermarket." (Compl.¶ 11, 13.) Plaintiffs Magnan, Jacqulin Shere, Rose Shere and Sontag purchased shares of Ultrafem "pursuant to the Offering and in the aftermarket." (*Id.* ¶¶ 12, 14, 15.) The Complaint alleges later that plaintiffs and the other members of the putative class purchased Ultrafem common stock "pursuant to and/or traceable to" the Registration Statement and the Prospectus. (*Id.* ¶¶ 112, 118.)

Purchasers in private or secondary market offerings do not have standing to bring actions under Section 12(2). *See Saslaw v. Al Askari*, No. 95

Civ. 7641, 1997 WL 221208, at *6 (S.D.N.Y. Apr. 25, 1997) (citing cases). Therefore, plaintiffs Berliner and Lewin clearly are precluded from asserting Section 12(2) violations. The other plaintiffs, however, do have standing. The Underwriter Defendants appear to quote plaintiffs as alleging that they purchased securities "pursuant or traceable to" Ultrafem's 1996 Offering. (*See* Jefferies Mem. at 5 n. 5.) Plaintiffs also quote the Complaint with the "pursuant or traceable" language. (Pl. Mem. at 38.) However, a review of the cited paragraphs of the Complaint reveals that both parties have erred in quoting the Complaint. The cited portions of the Complaint do not state that plaintiffs Magnan, Jacqulin Shere, Rose Shere and Sontag purchased shares "pursuant or traceable" to the Offering. Rather, the specific allegations state that those plaintiffs purchased Ultrafem shares "pursuant to the Offering and in the after-market during the Class Period." [11] (Compl.¶¶ 12, 14, 15.) Because these particular plaintiffs have alleged that they purchased shares "pursuant to the Offering", *i.e.*, in the Offering, their allegations may stand under Section 12(2).

█ Contrary to Section 12(2)'s standing requirements, standing under Section 11 is not limited to initial purchasers. *See, e.g., Milman v. Box Hill Sys. Corp.*, 192 F.R.D. 105, 108 (S.D.N.Y.2000); *Salomon Smith Barney v. Asset Securitization Corp.*, No. 98 Civ. 4186, 1999 WL 1095605, at *3 (S.D.N.Y. Dec. 3, 1999); *Adair v. Bristol Tech. Sys., Inc.*, 179 F.R.D. 126, 133 (S.D.N.Y.1998). Thus, plaintiffs making after-market purchases who can trace their securities to the Offering have standing under Section 11. *See Adair*, 179 F.R.D. at 133. Plaintiffs have pled that they made their purchases "pursuant to and/or traceable to the Registration Statement," (Compl.¶ 112), and thus, have standing under Section 11 here.

III. 1933 Act Claims—Section 11 and Section 12(2).

A. Section 12(2).

Defendants move to dismiss the § 12(2) claims on the grounds that plaintiffs have not pleaded any actionable misrepresentations or omissions in the Prospectus. Under Section 12(2),[12] buyers have action against sellers who make material misstatements or omissions "by means of a prospectus." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 115 S.Ct. 1061, 1064, 131 L.Ed.2d 1 (1995). As discussed above, only plaintiffs Magnan, Jacqulin Shere, Rose Shere and Sontag have standing to bring claims under Section 12(2).

B. Section 11.

Defendants also move to dismiss plaintiffs' Section 11 [13] claims on the same

---

**11.** While later paragraphs allege that "Plaintiffs and other members of the Class purchased Ultrafem shares pursuant to and/or traceable to the defective Prospectus," (*see, e.g.,* Compl. ¶ 118), plaintiffs' Section 12(2) claim incorporates the specific allegations that certain of the plaintiffs purchased the stock in the Offering, (*see* Compl. ¶ 115 (realleging ¶¶ 1–56).)

**12.** Section 12(2) provides as follows:
Any person who—. . .
(2) offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him. . . . 15 U.S.C. § 77l.

**13.** Section 11 provides as follows:
In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the same time of such acquisition he knew of such untruth or

grounds as the Section 12(2) claims. Although none of the parties specifically state how the alleged misstatements were incorporated in the Ultrafem Registration Statement as required by the terms of Section 11, I presume that the Prospectus was made part of the Registration Statement for purposes of this motion.

#### C. Section 15.

Plaintiffs also bring claims under Section 15 against all defendants. Section 15[14] makes controlling persons liable for primary violations of the Securities Act.

#### D. The Alleged Misstatements in the Prospectus.

The central inquiry in determining whether a prospectus is materially misleading is whether the representations therein, taken together and in context, would have misled a reasonable investor. *See I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991).

#### 1. Consumer Use Testing

■ The Individual Defendants and Contente contend that statements regarding the 80% of women interested in continuing to use INSTEAD and the 54% of women indicating likely use of INSTEAD as their primary method of feminine protection were not false or misleading and did not omit material facts. Plaintiffs contend that defendants failed to disclose the existence or results of the Clinical Trial that was conducted in addition to the consumer use study and that this failure to

disclose rendered the statement regarding the consumer use study false and misleading. (Compl.¶¶ 41–43.) The Complaint alleges that Ultrafem conducted a two-part pre-market evaluation: a clinical trial of safety and efficacy and a consumer use study. (*Id.* ¶ 42.) Plaintiffs appear to allege that the Clinical Trial revealed instances of leakage and cramping that were not, but should have been, disclosed.

Plaintiffs' claims with respect to this allegation are dismissed. The Complaint does not allege how the omission of such information made statements about the consumer use test false and misleading. Even if instances of leakage and cramping occurred, the results of the consumer use test stand alone, and plaintiffs do not allege that they are inconsistent. For example, plaintiffs do not allege that because of leaking and cramping 80% of the women tested would *not* continue to use INSTEAD. Plaintiffs argue in their brief that "secret information, namely the undisclosed Clinical Trial, rendered the Company's public statements concerning INSTEAD materially false and misleading." (Pl. Mem. at 17.) However, plaintiffs fail to show, in their Complaint or in their brief, *how* this failure to disclose rendered the Company's statements about the consumer use test false or misleading.

■ Plaintiffs also contend that defendants failed to disclose that the results of the Clinical Trial were never analyzed. (Compl.¶ 47.) This, too, is immaterial because it does not bear upon the results of the consumer use test.

omission) may, either at law or in equity, in any court of competent jurisdiction, sue ... (1) every person who signed the registration statement, (2) every person who was a director of (or person performing similar functions) ... the issuer ... [and] (5) every underwriter with respect to such security. 15 U.S.C. § 77k(a).

**14.** Section 15 provides:

Every person who, by or through stock ownership, agency or otherwise, or who, pursuant to or in connection with an agree-

ment or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist. 15 U.S.C. § 77o.

Plaintiffs complain further that defendants failed to disclose that Dr. Barbara North resigned as principal investigator of the Clinical Trial because of Ultrafem's refusal to analyze the data collected from the safety and efficacy portion of the Clinical Trial. (*Id.* ¶ 43.) This claim also must fail because, based on the facts alleged, it is not material to the results of the consumer use test. Also, plaintiffs do not allege that Dr. North communicated the reason(s) for her resignation to defendants nor do they allege any other facts surrounding her resignation (*e.g.*, date). Such conclusory allegations do not make out a claim.

Even if the claim is not time-barred, defendants' alleged nondisclosure of the methodology used to translate the study participants' questionnaire answers does not meet the standard for liability. (Compl.¶¶ 43–44.) Plaintiffs make no claim that the 80% and 54% figures were false or misleading. Plaintiffs allege that the questionnaire "asked the women to use a scale of 1 to 10 to rate their interests in the continued use of INSTEAD as their primary method of protection, with the number [sic] '1' and '2' meaning 'not at all' and the numbers '9' and '10' meaning 'very interested' or 'very confident.'" (*Id.* ¶ 43.) Plaintiffs do not state that the failure to reveal where on this continuum a woman's answer needed to fall to be included in the 80% and 54% figures makes the figures false and misleading. Furthermore, in their Complaint, plaintiffs do not contend that 80% of women did not want to continue to use INSTEAD or that 54% of women were not likely to use INSTEAD in the future.

▪ Plaintiffs argue in their brief that the Prospectus represented "that 80% of the target market of 58 million women who use feminine protection products in the United states alone would be interested in using INSTEAD as their primary method of protection for occasional use." (Pl. Mem. at 17 n. 12.) This is a farfetched reading of the Prospectus, particularly in light of the specific language therein which cautioned investors about the risks of relying on the consumer use test. (Prospectus, at 23 (Inherent Limitation of Market Research and Consumer Use Testing).) The "bespeaks caution" doctrine precludes any claim by plaintiffs that these statements were a faulty predictor of commercial success. "The bespeaks caution doctrine prevents a plaintiff from basing an action for fraudulent misrepresentation upon a statement that bespeaks caution of the very risk about which plaintiffs complain." *Saslaw*, 1997 WL 221208, at *7. Furthermore, the Prospectus disclosed that only 300 women participated in the consumer use study. (Prospectus, at 35.) The Prospectus also stated that the Company "believe[d]", based on the research, that "the remaining 26% of the [300] women would be likely to use INSTEAD for occasional use." (*Id.*) The Prospectus did not extrapolate the results of this study to the 58 million women in the United States as the plaintiffs suggest. Thus, plaintiffs fail to state a claim with respect to the questionnaire answers.

Last, plaintiffs allege that defendants failed to disclose Dr. North's advisements to Contente "of disturbing trends which became apparent from Dr. North's data regarding instances of cramping and leaking" among INSTEAD study participants. (Compl.¶ 45.) Plaintiffs also allege that "Dr. North advised defendant Contente that her data revealed numerous instances of cramping and leakage experienced by women who used the product." (*Id.* ¶ 49.) This allegation does not state a claim. First, plaintiffs do not allege that instances of cramping were caused by participants' use of INSTEAD. Second, plaintiffs do not allege, even approximately, how many instances of cramping and leaking are meant by the adjective "numerous" or any other facts indicating materiality. Third, plaintiffs do not allege how such alleged "trends" were disturbing (*e.g.*, quantity, severity, breadth amongst participants). Thus, plaintiffs fail to meet

the particularity requirements of Rule 9(b). Furthermore, plaintiffs do not allege how this information made the recitation of the consumer use test misleading or false or facts indicating materiality. Thus, plaintiffs' claims under Section 11 and Section 12(2) regarding the consumer use test are dismissed.

### 2. Design and Performance of IN-STEAD

■ Even if plaintiffs' allegations regarding INSTEAD's design and performance are not time-barred, plaintiffs have failed to state a claim. First, the assertions in the Prospectus about the design and performance of INSTEAD are expressly stated to be the Company's beliefs, and plaintiffs have pleaded no facts to show that the Individual Defendants and Contente did not believe that the product had certain design and performance benefits over other forms of protection or that such beliefs were unreasonable. *See International Business Machines Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir.1998) (opinion is actionable under the securities laws if the "speaker does not genuinely and reasonably believe it or if it is without a basis in fact."). More specifically, plaintiffs provide no facts to support their conclusory allegation that "thermoplastic" relates only to how the product is constructed rather than to how it fits. Even if thermoplastic did relate only to construction, plaintiffs have not alleged that INSTEAD does *not* "become[ ] more pliable at body temperature and mold[ ] to fit the individual wearer's anatomy." (Prospectus, at 27.) Thus, the use of the word "thermoplastic" does not make the thrust of the sentence, *i.e.*, that INSTEAD becomes more pliable at body temperature and molds to fit, materially false or misleading.

■ Also, the fact that the product could not "comfortably fit" all women is not inconsistent with the Prospectus' statement that the product molds to fit the individual user's anatomy. The Prospectus does not state that INSTEAD molds to fit *every* individual user's anatomy comfortably or that INSTEAD would fit all women. Thus, I find that plaintiffs have not sufficiently alleged that this statement was false or misleading or facts indicating materiality.

■ Plaintiffs also allege that INSTEAD "did not provide 'improved performance' because leakage remained a problem with INSTEAD, as it was with other forms of feminine protection" and, thus, Ultrafem's proclamation of INSTEAD's improved performance over currently-available forms of feminine protection was false. (Compl.¶ 49.) In further support of their claim, plaintiffs repeat their allegation that Dr. North had advised Contente that data "revealed numerous instances of cramping and leakage experienced by women" who used INSTEAD. (*Id.*)

Plaintiffs have not sufficiently alleged that the statement regarding "improved performance" was materially false or misleading. Plaintiffs do not claim that leakage was *more* of a problem with INSTEAD than with other forms of feminine protection or even an equivalent problem. Also, the Prospectus does not claim that users of INSTEAD would not experience *any* leakage. Indeed, as discussed above, plaintiffs do not quantify or even approximate the number or percentage of participants in the Clinical Trial who allegedly suffered leakage and cramping, or the instances of leaking and cramping. Thus, there is no basis for inferring that the disclosure of the alleged results of the Clinical Trial would have made the statement regarding "improved performance" false or misleading. Accordingly, the nondisclosure of the Clinical Trial is immaterial, and plaintiffs' claims with respect to such nondisclosure are dismissed.

For the same reasons, I dismiss plaintiffs' claims regarding the statement in the Prospectus, "The Company believes that the unique design of [INSTEAD] provides

... increased comfort." Plaintiffs have not stated facts that would make such belief unreasonable or that would demonstrate that INSTEAD was just as or less comfortable than other forms of feminine protection. For example, plaintiffs do not allege that women who used INSTEAD had just as much or more cramping than those who used other forms of feminine protection. Plaintiffs do not allege that insertion and removal of INSTEAD was more uncomfortable than other feminine protection products. Furthermore, the Complaint acknowledges that INSTEAD was designed to allow sexual intercourse during menstruation, (see Compl. ¶ 2), and does not allege that other forms of feminine protection allow intercourse. Plaintiffs do not contest that the higher placement of INSTEAD in the vaginal canal, as compared to prior menstrual cup-like devices, provided more comfort, as described in the Patent. Plaintiffs also do not quantify the number of instances of cramping or percentage of women suffering cramping allegedly discovered by Dr. North in the Clinical Trial. Thus, plaintiffs have not adequately pleaded that statements regarding INSTEAD's design and performance are materially false or misleading so as to create liability.

### 3. Uniqueness and Significance of INSTEAD

Plaintiffs contend that defendants failed to disclose the existence of other menstrual cup devices and their failures and that the statement in the Prospectus regarding Ultrafem's belief as to the "significance" of the technological development of INSTEAD is false and misleading. In addition, plaintiffs allege that defendants failed to disclose that INSTEAD's "prospects for mass acceptance posed an extreme risk." (Compl. ¶ 56(e).)

▮ I have already determined that the nondisclosure of the existence of other menstrual cup devices is a claim that is barred by the statute of limitations due to the Bloomberg News article and the Pat-

ent. However, even if the statute of limitations did not bar this claim, plaintiffs have not alleged an actionable misrepresentation.

Plaintiffs have not pled any facts to show that defendants did not believe or that it was unreasonable for the defendants to believe that INSTEAD was not a significant technological development. *See International Business Machines*, 163 F.3d at 109. The Patent states that certain cup-shaped absorptive tampons are "bulky and would be difficult to use and uncomfortable to wear" and "would have the same dangers of infection presented by conventional absorptive tampons." (Curnin Aff. Ex. C.)

In addition, the Patent notes that other internal vaginal discharge collection devices "all suffer from poor ergonomic design" and are "difficult to insert and remove, uncomfortable to wear, and/or unreliable." (*Id.*) The Patent continues to discuss that prior devices are worn in a lower region of the vaginal canal causing difficulty in removing the devices and spillage, are expensive to manufacture and cause irritation. (*Id.*) The Patent notes that "there is a need in the art for a vaginal discharge collection device that avoids the problems associated with napkins and tampons, and that is convenient, comfortable, reliable and economical." (*Id.*) Most importantly, the Patent states, "[t]he present invention alleviates to a great extent the disadvantages of the known vaginal discharge collection devices by providing a vaginal discharge collection device including an elastomeric rim with a generally rectangular cross section which creates a collection space for collecting vaginal discharge, and a flexible film reservoir attached to the rim." (*Id.*) When discussing the SoftCup Technology, the Patent notes that the reservoir depth of the SoftCup Technology makes it easier to remove and that the ability of the reservoir to extend into a cup-shaped configuration "minimizes the risk of spilling menstrual fluid dis-

charge during removal and disposal of the device." (*Id.*) "The preferred material for the rim exhibits a softening effect upon exposure to the temperatures encountered in the vaginal canal. This advantageous property allows the rim to more fully conform to the distinct shape of an individual vaginal vault once inserted. This offers greater comfort during wear as well as added protection against potential leakage during use." (*Id.*) The Patent notes that this device can be economically manufactured because it does not have to be tailored to an individual user.

Thus, the Patent supports the reasonableness of defendants' belief that IN-STEAD was a significant technological development and that it differed from other menstrual cup devices. The Complaint fails to allege any facts to the effect that INSTEAD did not differ from prior menstrual cup devices or any facts to contradict the statements in the Patent.

 Plaintiffs assert that another menstrual cup product called the "Keeper" was "on the market" at the time of the Offering and that the defendants' failure to disclose its existence rendered the Prospectus' statement "[INSTEAD] differs from other forms of feminine protection currently on the market in that it collects, rather than absorbs, menstrual fluid" materially false and misleading. I disagree.

The statement in the Prospectus refers to other *forms* of feminine protection, not other feminine protection *products*. "Other forms of feminine protection" to a reasonable reader means other types of feminine protection, *e.g.*, tampons or pads. Plaintiffs allege that "the Keeper is also a cup-like device which collects rather than absorbs menstrual fluids" and that "INSTEAD did not differ from the Keeper." (Compl.¶ 56(c).) Therefore, plaintiffs concede that INSTEAD and the Keeper are the same *form* of feminine protection. Furthermore, contrary to plaintiffs' assertions, the Prospectus does not state that INSTEAD is the only

menstrual-cup device on the market, (*see* Pl. Mem. at 23 n. 17), and, in any event, plaintiffs allege no facts from which materiality can be inferred, *e.g.*, that the Keeper has a significant enough market share to have a material impact on the prospects for INSTEAD. Therefore, the statement regarding the difference between INSTEAD and other forms of feminine protection is not materially false or misleading.

 The defendants were not under an obligation to disclose that INSTEAD's "prospects for mass acceptance posed an extreme risk." (Compl.¶ 56(e).) Plaintiffs have not alleged any facts to demonstrate that INSTEAD's prospects were extremely risky or that defendants believed that they were risky. In addition, the problems with other menstrual cup devices were disclosed in the Patent. "A company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's conditions and the value of its stock." *In re Syntex Corp. Sec. Litig.*, Civ. No. 92–20548, 1993 WL 476646, at \*7 (N.D.Cal. Sept. 1, 1993).

Even if a duty did exist, here, the Prospectus contained a section entitled "Risk Factors" with a subheading entitled "Marketing Risks; Uncertainty of Consumer Acceptance." (Prospectus, at 9–10.) The subsection states,

> Because INSTEAD is fundamentally different from nearly all commercially available forms of feminine protection, successful introduction of INSTEAD will face several obstacles, including a change in established personal hygiene regimen and educating potential consumers on how to use INSTEAD. Furthermore, the Company will be competing with other products which are already familiar to the target audience.... There can be no assurance that the Company will develop an effec-

tive marketing or advertising campaign to overcome these obstacles. (*Id.* at 10.) Thus, the Prospectus noted other feminine hygiene products and obstacles to INSTEAD's acceptability. Because the Prospectus warned of the risk that INSTEAD may not have "mass acceptance," the statement at issue is not false or misleading. *I. Meyer Pincus,* 936 F.2d at 763; *Saslaw,* 1997 WL 221208, at *7 (claim must be dismissed where prospectus warns of risk plaintiffs claim was not disclosed).

### 4. Financial Condition

■ Plaintiffs contend that contrary to the statements in the Prospectus, defendants knew that Ultrafem's financial resources and the proceeds from the Offering would not meet Ultrafem's working capital requirements for the subsequent twelve months. Plaintiffs rely on alleged "internal Company reports" which supposedly contradicted the alleged Business Plan. These internal company reports supposedly stated that the average INSTEAD user would use fewer cups a month than set forth in the Business Plan. Furthermore, women reused INSTEAD, thus reducing the number of cups per month used. The alleged decreased cup usage resulted in decreased sales and a need for cash and expensive advertising. Plaintiffs conclude that at the time the Prospectus was issued, Ultrafem required additional financing and such financing was not "unforeseen."

Plaintiffs' allegations are insufficient. First, the Prospectus states that Ultrafem believed that working capital requirements would be satisfied for at least twelve months post-Offering. (*See* Prospectus, at 9.) As a preliminary matter, the Complaint acknowledges that Ultrafem's capital lasted for nearly fifteen months, clearly negating any claim of misrepresentation. (*See* Compl. ¶¶ 92–93.) Second, plaintiffs have not alleged that Ultrafem's working capital projections were based on the alleged Business Plan, that the basis for the working capital projections was disclosed to investors, or that such working capital projections did not account for the possibility of decreased usage. Third, plaintiffs do not allege that the "internal Company reports" that showed decreased usage were communicated to the defendants prior to the issuance of the Prospectus. Thus, plaintiffs do not state a claim with respect to the Company's belief regarding working capital because they have not sufficiently alleged that defendants knew or recklessly disregarded that their statements of their beliefs regarding the Company's working capital were false at the time they were made.

In addition, with respect to the "unforeseen risks," the Prospectus states that "the Company may require additional financing if unforeseen risks are encountered." (Prospectus, at 9.) Plaintiffs concede that Ultrafem had working capital for almost fifteen months. (Compl. ¶¶ 92–93.) Therefore, no additional financing was required during the twelve-month period discussed in the Prospectus, and the statement was not false or misleading. Indeed, Ultrafem recognized and informed investors that it would require financing over and above the proceeds from the Offering. (Prospectus, at 13.) The Offering proceeds plus additional capital were believed to be sufficient to "commence the introduction of INSTEAD into approximately 25 to 50% of the United States markets." (Prospectus, at 13.) Thus, Ultrafem told investors, "[i]f the Company is unable to raise additional capital or arrange satisfactory working capital or additional equity financing, the Company may be unable to complete the distribution of [INSTEAD] into the full United States market." (*Id.* at 9.) Therefore, because the Company did not require additional financing during the twelve-month period that it believed it would have sufficient working capital and the Prospectus warned that the Company might need additional financing to introduce INSTEAD to the full United States market, plaintiffs have not stated a cause

of action for a false or misleading statement in the Prospectus.

■ In sum, plaintiffs' claims under Section 11 and Section 12(2) are dismissed. In addition, because plaintiffs have not established a primary violation of sections 11 or 12(2) by the Individual Defendants or Contente and have not pled any facts showing that Jefferies or Hampshire exercised control over the Individual Defendants or Contente, the Section 15 claims are dismissed.

## IV. Exchange Act Claims—Section 10(b), Rule 10b–5 and Section 20(a) [15]

### A. Section 10(b) and Rule 10b–5.

■ To state a cause of action under Section 10(b) and Rule 10b–5, plaintiffs must plead that each defendant (1) acting with scienter, (2) made a material false representation, or omitted to disclose material information, or engaged in a scheme to defraud, (3) in connection with the purchase or sale of securities, (4) to plaintiffs' detrimental reliance. *See Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 189 (2d Cir.1998); *Ellison,* 36 F.Supp.2d at 636.

■ Claims under Section 10(b) and Rule 10–b(5) are subject to Rule 9(b)'s particularity requirements, *see Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127–28 (2d Cir.1994), and the heightened pleading requirements of the PSLRA, *see* 15 U.S.C. § 78u–4(b)(2). The PSLRA "heightened the requirement for pleading scienter to the level used by the Second Circuit." *Press,* 166 F.3d at 538.

■ In the Second Circuit, under Rule 9(b), a plaintiff must " 'allege facts that give rise to a strong inference of fraudulent intent.' " *Chill v. General Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996) (quoting *Acito,* 47 F.3d at 47.) This strong inference of fraudulent intent can be established "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts

that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields,* 25 F.3d at 1128; *accord Press v. Chemical Investment Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999).

### B. Section 20(a).

■ Section 20(a) provides that "[e]very person who ... controls any person liable [for a § 10(b) violation] ... shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). To establish a violation of Section 20(a), plaintiffs must allege: (1) an underlying primary violation by the controlled person; (2) control over the controlled person; and (3) the controlling person's culpable and meaningful participation in the fraud perpetrated by the controlled person. *See S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996). Control may be established by showing that "the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.' " *Id.,* 101 F.3d at 1473 (quoting 17 C.F.R. § 240.12b–2).

### C. The Alleged Post–Offering Misstatements

For the reasons stated above, plaintiffs' allegations regarding misstatements or omissions about INSTEAD that were repeated post-Offering are dismissed.

■ In addition to those allegations discussed above, plaintiffs have alleged that defendants failed to disclose that by June 1998 Ultrafem was "desperate" for additional capital (including a $50 million infusion) and that without such capital, Ultrafem could not "continue to manufacture and sell its product." (Compl.¶¶ 84–86.) Ultrafem's Form 10–K, quoted in the Complaint, says otherwise. The September 29, 1997 Form 10–K states that Ultrafem's need for funds "has increased from

15. These claims are alleged against the Individual Defendants and Contente only.

period to period as it has incurred expenses" for a variety of activities. (*Id.* ¶ 38.) The Form 10–K continues, "The Company will require additional financing to meet these needs ... The Company is currently seeking to raise up to $50 million in a private placement." (*Id.*) Defendants were not obligated to characterize their need for additional financing as "desperate," "dire" or otherwise. *See Diamond v. Arend*, 649 F.Supp. 408, 415 (S.D.N.Y. 1986) (no duty to characterize facts with "pejorative nouns or adjectives"). As noted by the Individual Defendants, the Complaint does not dispute that Ultrafem's public filings gave accurate reports of Ultrafem's ongoing losses. (*See* Compl. ¶¶ 65, 86 ($9 million loss for the quarter ending March 31, 1997; $21 million loss for nine months ending March 31, 1997).) Thus, Ultrafem's financial condition and its need for additional financing were properly disclosed.

■ Plaintiffs' allegations regarding materially false statements in connection with Ultrafem's distribution arrangements also fail. Plaintiffs fail to specify which financial statements purportedly did not comply with GAAP. The Complaint refers to financial statements in Ultrafem's 10–K, which reflected the Company's condition as of June 1997, and then attempts to paint those financial statements as flawed according to an "Inventory and Accounts Receivable" schedule (attached to a June 1998 bankruptcy filing) that reflects information as of May 31, 1998. Plaintiffs draw no connection between revenue reported in 1997 and the financial information allegedly existing as of May 31, 1998. For example, plaintiffs allege that Rite Aid, a chain store, received a discount on purchases of INSTEAD and that it purchased INSTEAD with a right of return. (Compl. ¶ 82.) Plaintiffs glean this information from a document reflecting information as of May 31, 1998. (*Id.*) However, plaintiffs do not allege that these purchases were reflected in Ultrafem's financial statements in the Form 10–K. Furthermore, plaintiffs do not allege with any particularity their allegations regarding Ultrafem's "enormous discounts" to "many chains." (Compl. ¶ 77.) Thus, these allegations fail to plead fraud with particularity under Rule 9(b).

### E. Allegations of Scienter.

In addition to the failure to plead material omissions or misrepresentations, plaintiffs have failed to plead scienter of the Individual Defendants and Contente. Plaintiffs have not raised a strong inference of intent to defraud because they have not sufficiently alleged that the Individual Defendants or Contente had the motive and opportunity to commit fraud or evidenced conscious misbehavior or recklessness.

■ Plaintiffs allege that four of the eleven individual defendants (Andersen, Contente, Reap and Hinch) had an illicit motive because they could be entitled to additional compensation based on Ultrafem's performance. (Compl. ¶¶ 94–97.) A generalized interest in increased compensation is an insufficient motive for fraud. *See, e.g., Acito*, 47 F.3d at 54 (executive incentive compensation alone cannot provide a motive for fraud or "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions"); *Glickman v. Alexander & Alexander Servs. Inc.*, No. 93 Civ. 7594, 1996 WL 88570, at *6 (S.D.N.Y. Feb. 29, 1996) (preservation of an executive's financial interest does not establish motive because "an executive's self-interest is often closely tied to improving the company's prospects").

■ Plaintiffs allege that defendant Zesiger had a motive to commit fraud because she sold Ultrafem stock on or about November 17, 1997. (Compl. ¶ 98.) To permit an inference of scienter through allegations of insider trading, "plaintiffs must allege that the trades were made at times and in quantities that were suspi-

cious enough to support the necessary strong inference of scienter." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir.1997); *accord Acito*, 47 F.3d at 54; *Duncan v. Pencer*, No. 94 Civ. 0321, 1996 WL 19043, at *12 (S.D.N.Y. Jan. 18, 1996). Plaintiffs allege that Zesiger sold 40,000 shares in November 1997 for $3.64 per share. (Compl.¶ 98.) Zesiger beneficially held a total of 1,681,359 shares. (*Id.*) A sale of approximately 2.3% of an insider's shares one year after the alleged fraud began does not raise an inference of scienter. *See In re Glenayre Tech., Inc. Sec. Litig.*, 982 F.Supp. 294, 299 (S.D.N.Y. 1997) (defendants' sale of "approximately 5% of their holdings" does not raise inference of scienter). Furthermore, plaintiffs make no specific allegation as to why Zesiger's trades are suspicious. The Complaint merely states, in conclusory fashion, that "this was a sale by an insider possessing material adverse information." (Compl.¶ 98.)

■ Plaintiffs claim defendant Peebler's relationship with Bozell provided him with a motive to defraud. Plaintiffs allege only that Bozell received $21.8 million in fees from Ultrafem through December 31, 1997. (Compl.¶ 5.) Plaintiffs do not allege that Peebler received any of these fees, how Ultrafem's stock price was affected by such fees, if at all, or that the amount of fees paid to Bozell was improper for the work that Bozell performed. Thus, plaintiffs do not adequately alleged Peebler's scienter.

The Complaint also alleges that defendant Andersen "gave presentations containing falsely inflated sales projections to potential investors in April 1997" and that the projections were prepared by Ultrafem employees who were told to "disregard actual historical sales in preparing forecasts so as to falsely inflate the projected sales." (Compl.¶ 64.) This vague allegation of fraud is not pleaded with particularity. Plaintiffs have not alleged who told the employees to disregard historical sales or when these employees were told. Fur-

thermore, the Complaint fails to state what Mr. Andersen said and to whom he said it. The Complaint also does not set forth how Mr. Andersen's presentation was false. Thus, plaintiffs have not established Andersen's scienter and make no particularized allegations of scienter as to Contente or any other Individual Defendants.

Plaintiffs also fail to allege facts constituting strong evidence of conscious misbehavior or recklessness by the Individual Defendants and Contente. Plaintiffs argue that scienter can be inferred from those defendants' knowledge, by virtue of their corporate positions, that Ultrafem was recognizing revenue in violation of GAAP. As discussed above, the Complaint fails to allege facts supporting an allegation of GAAP violation. Moreover, alleged violations of GAAP, without more, do not demonstrate scienter. *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999); *Chill*, 101 F.3d at 270; *Novak v. Kasaks*, 26 F.Supp.2d 658, 663 (S.D.N.Y. 1998).

Plaintiffs argue that they have alleged other specific allegations of fraud which, when coupled with allegations of GAAP violation, may give rise to an inference of fraudulent intent. Plaintiffs contend that

> the determination by [Ultrafem] management not to analyze the Clinical Trial data, to only make reference in the Prospectus to the positive (questionnaire) aspect of the 1991 study and the non-disclosure of Dr. North's resignation and the reasons therefore are all examples of specific actions and facts reflecting 'conscious behavior' that give rise to an inference of fraud.

(Pl. Mem. at 42.) However, none of these allegations provides the "strong circumstantial evidence of conscious misbehavior or recklessness" necessary to establish scienter. *Shields*, 25 F.3d at 1128. "[V]iolations of GAAP may give rise to an inference of fraudulent intent only when coupled with *specific and properly pled allegations of fraud." Novak*, 26 F.Supp.2d

at 663 (emphasis added). I have already determined that plaintiffs' allegations are not pled with sufficient particularity to establish fraud, and, thus, they cannot buttress a finding of scienter with respect to the alleged GAAP violations.

Thus, plaintiffs have failed to plead violations of Section 10(b) and Rule 10b–5. Because plaintiffs have not sufficiently alleged primary liability, plaintiffs cannot establish control person liability under Section 20(a). *See, e.g., In re Hudson Tech. Sec. Litig.,* No. 98 Civ. 1616, 1999 WL 767418, at *13 (S.D.N.Y. Sept. 28, 1999).

III. Dismissal with Prejudice.

Defendants request that the Complaint be dismissed with prejudice due to the opportunity afforded to plaintiffs to replead after receiving letters detailing deficiencies in the prior pleadings. Because I find that plaintiffs had an adequate opportunity to replead after they were informed of the defendants' views of the failures of the prior complaints, dismissal of the Complaint is with prejudice.

### CONCLUSION

For the reasons stated above, defendants' motions to dismiss the Complaint with prejudice are granted.