**In re ALCATEL SECURITIES LITIGATION**

**No. 02 Civ. 3818(RCC).**

United States District Court, S.D. New York.

Feb. 28, 2005.

Peter Edward Seidman, Milberg Weiss Bershad & Schulman LLP, New York, NY, Samuel Howard Rudman, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, Melville, NY, Steven G. Schulman, Milberg Weiss Bershad & Schulman LLP, New York, NY, for Pyramid Holdings, Inc.

Giyoung Song, Lea Haber Kuck, Skadden, Arps, Slate, Meagher & Flom, LLP, New York, NY, Robert Emanuel Zimet, Skadden, Arps, Slate,Meagher & Flom, Washington, DC, for Alcatel Sa, Serge Tchuruk, Jean Pierre Halbron.

Peter Edward Seidman, Milberg Weiss Bershad & Schulman LLP, New York, NYfor Jay Hansbro.

Gregory Mark Nespole, Freeman & Herz, L.L.P., New York, NY, for Stanley Sved.

Steven G. Schulman, Milberg Weiss Bershad & Schulman LLP, New York, NY, for Victoriaqno V. Fernandez.

Marvin Lawrence Frank, Murray, Frank & Sailer, LLP, New York, NY, for August Family Trust.

## OPINION & ORDER

CASEY, District Judge.

This purported class action was brought by investors, other than those named as defendants, who purchased or otherwise acquired the American Depository Shares ("ADS") of Alcatel relating to its Class O common shares in, or traceable to, the initial public offering of these ADS on October 20, 2000 ("IPO"), Class O common shares in the form of ADS between October 20, 2000 and May 29, 2001, or Class A common shares in the form of ADS between May 1, 2000 and May 29, 2001 ("Plaintiffs") against Alcatel SA ("Alcatel"), Serge Tchuruk ("Tchuruk"), Jean–Pierre Halbron ("Halbron"), and twenty-one other defendants for alleged violation of the federal securities laws.[1] Alcatel, Tchuruk, and Halbron ("Defendants"), by their counsel, move to dismiss Plaintiffs' consolidated amended class-action complaint, filed November 18, 2002 ("Amended Complaint") for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and failure to plead fraud with sufficient particularity under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995

1. Plaintiffs initially brought five securities actions against Defendants after the price for Alcatel ADS dropped in May 2001; the five actions—Nos. 02 Civ. 3818 (complaint filed May 17, 2002), 02 Civ. 4044 (complaint filed May 28, 2002), 02 Civ. 4904 (complaint filed June 25, 2002), 02 Civ. 4977 (complaint filed June 26, 2002), and 02 Civ. 5279 (complaint filed July 10, 2002)—were consolidated on August 12, 2002. The Court has not certified this case as a class action in accordance with Rule 23(c) of the Federal Rules of Civil Procedure. Daniel Bernard, Phillippe Bissara, Frank Bicount, Paolo Fresco, Jacques Friedman, Noel Goutard, Pierre–Louis Lions, Thierry de Loppinot, Jean–Marie Messier, Bruno Vaillant, Marc Vienot, Helmut Werner, Jozef Cornu, Pascal Durand–Barthez, Morgan Stanley & Co. International Ltd., Societe Generale, Credit Suisse First Boston (Europe) Ltd., Merrill Lynch International, Credit Agricole Indosuez Lazard Capital Markets, J.P. Morgan Securities Ltd., and Lehman Brothers International (Europe) were named as defendants in the complaint filed in 02 Civ. 5279 and were therefore added as defendants in this case when the actions were consolidated. None of these twenty-one parties is mentioned as a defendant in Plaintiffs' consolidated amended class-action complaint, filed November 18, 2002 ("Amended Complaint"); although analyst reports prepared by J.P. Morgan Securities Ltd., Merrill Lynch, and Morgan Stanley Dean Witter are cited by Plaintiffs in support of their claims against Alcatel, Tchuruk, and Halbron, Plaintiffs do not allege any violation of the securities laws by those companies, nor do they make any mention in the Amended Complaint of "Morgan Stanley & Co. International Ltd." or "Merrill Lynch International," the specific entities named as defendants in the consolidated action. Plaintiffs fail to state a claim against any of these twenty-one defendants, there is no indication that any of these defendants was served with either the original complaint (02 Civ. 5279) or the Amended Complaint (02 Civ. 3818), and none of these parties has appeared in this action to date. Accordingly, this action is dismissed as against these twenty-one defendants.

("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (1995) (codified as amendments to 15 U.S.C. §§ 77–78 and 18 U.S.C. § 1964). Defendants argue that Plaintiffs' claims are time-barred; that the Amended Complaint fails to plead violations of either the 1933 Securities Act or the 1934 Securities and Exchange Act with sufficient particularity; and that the control-person claims against Tchuruk and Halbron fail for lack of a predicate act. For the following reasons, Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

In their Amended Complaint, Plaintiffs allege violations of (1) section 11 of the 1933 Securities Act, 15 U.S.C. § 77k, by all Defendants; (2) section 12(a)(2) of the 1933 Securities Act, 15 U.S.C. § 77l, by Alcatel; (3) section 15 of the 1933 Securities Act, 15 U.S.C. § 77o, by Tchuruk and Halbron, as controlling persons of Alcatel to the extent that Alcatel is found liable under section 11 or section 12(a)(2); (4) section 10(b) of the 1934 Securities and Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, by all Defendants; and (5) section 20(a) of the 1934 Securities and Exchange Act, 15 U.S.C. § 78t(a), by Tchuruk and Halbron for derivative liability to the extent that Alcatel is found liable under section 10(b) and Rule 10b–5. (Amended Complaint ¶¶ 20, 215–50.) Plaintiffs allege that they bought Alcatel Class A or Class O ADS at artificially inflated prices between May 1, 2000 and May 29, 2001 (Plaintiffs' proposed "Class Period"); Class A ADS were listed and actively traded on the New York Stock Exchange during the putative Class Period under the symbol "ALA" and Class O ADS similarly traded on the Nasdaq under the symbol "ALAO." (Id. ¶¶ 1, 24–28, 31.) Plaintiffs argue that Defendants' public statements regarding Alcatel and its Op-

tronics Division, which designs, manufactures, and sells high-performance fiberoptic components for use in terrestrial and submarine telecommunications networks, had a similar impact on Class A and Class O ADS, which traded in tandem. (Id. ¶¶ 30, 32.) The following describes the allegations in the Amended Complaint, which the Court assumes are true for the purpose of this motion.

Alcatel is a French telecommunications company with its executive offices and principal place of business in Paris; an American subsidiary maintains an executive office in Plano, Texas. (Id. ¶¶ 2, 29.) During the proposed Class Period, Halbron was Alcatel's Chief Financial Officer and Tchuruk was Alcatel's Chief Executive Officer and Chairman of the Board of Directors. (Id. ¶¶ 2, 33–34.)

Plaintiffs allege that Tchuruk caused Alcatel to embark upon an acquisition strategy in the late 1990s, a period when the United States economy was experiencing substantial and rapid growth in telecommunications spending, by purchasing various technology companies, including digital-switch maker Packet Engines, Inc. ("Packet Engines") in 1998 and Internethardware company Xylan, Inc. ("Xylan") in 1999. (Id. ¶¶ 2–3, 46–49.) By 2000, "Alcatel had become a major force in the North American telecommunications market," but the telecommunications industry's spending came to an abrupt halt that year, and Alcatel's largest customers canceled billions of dollars of equipment contracts with Alcatel. (Id. ¶¶ 3–4, 51, 89.)

Plaintiffs allege that, unlike their competitors, Alcatel failed to make negative disclosures "that the dramatic slowdown in spending would have a material adverse effect on [the company]." (Id. ¶ 51.) To the contrary, beginning in May 2000, Defendants allegedly made misleading or incomplete public statements and engaged in

a variety of accounting manipulations to create the impression that Alcatel was immune to the rapid decline of the telecommunications market and the growing credit shortage in the industry, knowing or recklessly ignoring that the misleading statements or omissions "would adversely affect the integrity of the market" for Alcatel stock; these alleged representations were intended to enable Alcatel to raise cash and artificially inflate ADS value for use as currency to continue the company's acquisition campaign. (*See id.* ¶¶ 7, 33, 35–38, 47–48.) Plaintiffs allege that Defendants overstated Alcatel's assets, shareholders' equity, net income, and earnings per share; falsely represented that Alcatel's growth and earnings trends would continue despite the industry's downturn; and created the illusion of strong earnings growth by failing to write-down excess and obsolete inventory and declines in the value of goodwill resulting from "material negative developments" with the Packet Engines and Xylan acquisitions,[2] all in violation of generally accepted accounting principles ("GAAP"), the rules recognized by the accounting profession as those necessary to define accepted accounting practice at a particular time. (*Id.* ¶¶ 4–9, 52–53, 72.)

Alcatel filed a Prospectus and a Registration Statement with the United States Securities and Exchange Commission ("SEC") on October 19, 2000 on Form F–3, which incorporated prior financial results by reference. (*Id.* ¶¶ 10–11.) In the October 20, 2000 IPO, Alcatel issued "O" shares, a "tracking" stock to follow the performance of the Optronics Division while enabling Alcatel to retain 100% ownership of the unit, thereby raising approximately $1.2 billion and creating additional stock currency, allegedly to aid Alcatel's acquisition strategy. (*Id.*) Plaintiffs allege that the Prospectus and Registration Statement created the false and misleading impression that Alcatel was thriving in the face of the industry downturn and contained actionable omissions and actionable misstatements. (*See id.* ¶¶ 10–11, 144–48.)

Shortly after the IPO, Alcatel announced that it had invested $700 million in its customer 360networks Corporation ("360networks") in exchange for that company's agreement to purchase over $1 billion in equipment from Alcatel to create a proposed trans-Pacific fiber-optic network. (*Id.* ¶ 12.) Plaintiffs allege that Alcatel did no due diligence before making this investment; made the investment knowing or recklessly disregarding that a glut of trans-Pacific fiber-optic capacity had already been built and that demand for such capacity was falling rapidly; issued false and misleading assurances to investors in support of the arrangement with 360networks despite knowledge or reckless disregard of negative developments and in violation of GAAP; and ultimately failed to take a full write-down of the investment in 360networks in a timely manner.[3] (*Id.* ¶¶ 13–14.)

**2.** "Although the definition of goodwill has taken different forms over the years, the shorthand description of good-will as 'the expectancy of continued patronage,' provides a useful label with which to identify the total of all the imponderable qualities that attract customers to [a] business." *Newark Morning Ledger Co. v. United States,* 507 U.S. 546, 555–56, 113 S.Ct. 1670, 123 L.Ed.2d 288 (1993) (internal citation omitted).

**3.** "[A] business must 'write down' the value of [an] asset each year to reflect its waning worth. The amount of the write down is reflected on the business's income statement each year as an operating expense." *United States v. Winstar Corp.,* 518 U.S. 839, 851, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (internal citations omitted).

Plaintiffs allege that, as the downward trend in the telecommunications industry continued through 2000 and into 2001, Alcatel continued to downplay negative developments and its inventory buildup "to perpetuate the false impression that Alcatel could thrive in a very challenging U.S. economic environment ... [by] conceal[ing] the significant bad news of its long overdue need to write-down bloated inventories, overstated goodwill, and the Company's investment in 360networks." (*Id.* ¶¶ 15–16.) In March 2001, Alcatel began to engage in merger talks with Lucent Technologies ("Lucent"), a deal that Plaintiffs allege was to be "the culmination of Tchuruk's plan," but two months later, on May 29, 2001, Alcatel announced that the parties could not reach an agreement. (*Id.* ¶ 16.)

Mere hours after announcing that there would be no merger between Alcatel and Lucent ("[w]ith the need to conceal the bad news gone"), Alcatel issued an unexpected and severe profit warning, announcing that it expected to report a second-quarter loss of approximately $2.6 billion— including charges associated with a write-down of goodwill for Alcatel's Xylan and Packet Engines acquisitions, a write-down of Alcatel's entire investment in 360networks, and various inventory write-downs—and revising the outlook for the Optronics Division in light of the unit's "high exposure to the submarine market and the increased lack of visibility and potential delays in large projects, as well as inventory build-ups." (*Id.* ¶¶ 17–18.)

Following the May 29, 2001 announcements, the market price of Alcatel Class O ADS declined by 11%, from a May 29 closing price of $21.26 per share to a May 30 closing price of $18.92 per share. (*Id.* ¶ 19.) Similarly, Alcatel Class A ADS declined by 8.8%, from $27.14 to $24.74 per share. (*Id.*) At the time the Amended Complaint was filed, Class O ADS traded at $4.57 per share and Class A ADS traded at $13.20 per share. (*Id.*) Plaintiffs claim that the market price of Alcatel's ADS has never recovered. (*Id.*)

## II. DISCUSSION

### A. Standard of Review

In deciding this motion to dismiss under Rule 12(b)(6), the Court construes Plaintiffs' Amended Complaint liberally, accepts all factual allegations in the Amended Complaint as true, and draws all reasonable inferences in Plaintiffs' favor. *See Desiano v. Warner–Lambert Co.*, 326 F.3d 339, 347 (2d Cir.2003); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002). The Court "may not consider matters outside the pleadings but may consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings ... [as well as] public disclosure documents that have been filed with the Securities Exchange Commission." *In re Rediff.Com India Ltd. Sec. Litig.*, No. 01 Civ. 3020(SAS), 2004 WL 2320364, at *8 (S.D.N.Y. Oct.15, 2004); *see also Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." (internal citations omitted)); *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 431, 446 n. 19 (S.D.N.Y.2003) (noting that news articles referenced in the pleadings "are appropriately considered on a motion to dismiss").

The Court cannot dismiss Plaintiffs' Amended Complaint unless it is clear that

no relief could be granted under any set of facts that Plaintiffs could prove consistent with their allegations. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995); *Adams v. Intralinks, Inc.*, No. 03 Civ. 5384(SAS), 2004 WL 1627313, at *3 (S.D.N.Y. July 20, 2004). "The task of the court in ruling on a rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Adams*, 2004 WL 1627313, at *3 (internal quotations omitted). At this stage, and in this limited task, the issue is not whether Plaintiffs will ultimately prevail on their claims, but whether they are entitled to offer evidence to support the allegations in their Amended Complaint. *See Desiano*, 326 F.3d at 347; *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

**B. The Timeliness of Plaintiffs' Securities Act and Exchange Act Claims**

All of Plaintiffs' claims are subject to a one-year statute of limitations. Plaintiffs' claims under sections 11, 12(a)(2), and 15 of the 1933 Securities Act ("Securities Act") are subject to the one-year statute of limitations in section 13 of that Act. *See* 15 U.S.C. § 77m (stating that actions under sections 11 and 12(a)(2) must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence"); *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 n. 1 (2d Cir.1993) ("Since Section 15 merely creates a derivative liability for violations of Sections 11 and 12, Section 13 applies to it as well."). And Plaintiffs' claims under sections 10(b) and 20(a) of the 1934 Securities and Exchange Act ("Exchange Act") are subject to the one-year statute of limitations in section 9(e) of that Act. *See* 15 U.S.C. § 78i(e) ("No ac-

tion shall be maintained ... under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation."); *Dodds*, 12 F.3d at 350 n. 2 ("Because Section 20 merely creates a derivative liability for violations of other sections of the Act, claims under Section 20 are governed by the limitations periods for those other sections."); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 359–60, 364 & n. 9, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (extending the limitations period of section 9(e) to claims under section 10(b)). The Court need not address the three-year statute of limitations under section 13 of the Securities Act, 15 U.S.C. § 77m, because the parties do not dispute that Plaintiffs' action is not time-barred by that provision. The Court also need not address whether the statute-of-limitations provision of Section 804 of Sarbanes–Oxley, 28 U.S.C. § 1658—which extends the statute of limitations for claims involving "fraud, deceit, manipulation, or contrivance in contravention of ... the securities laws" to two years from discovery or five years from violation—would apply to the claims here (i.e., whether these claims sound in "fraud, deceit, manipulation, or contrivance") because the Second Circuit has held that Section 804 does not apply retroactively to revive otherwise time-barred claims. *See In re Enter. Mortgage Acceptance Co. Sec. Litig.*, 391 F.3d 401, 411 (2d Cir.2004).

Defendants argue that Plaintiffs' claims are time-barred because (1) Plaintiffs had "inquiry notice" of the alleged underlying facts prior to May 17, 2001 (i.e., more than one year before Plaintiffs brought the first complaint in this action), and (2) the substantive claims and a class of plaintiffs first appearing in the November 18, 2002 Amended Complaint do not "relate back" for statute-of-limitations purposes to the original May 17, 2002 complaint. The

Court may "dismiss claims when it is apparent from the complaint and documents referenced therein that they are barred by the applicable statute of limitations." *Fezzani v. Bear Stearns & Co.*, No. 99 Civ. 0793(RCC), 2004 WL 744594, at *6 (S.D.N.Y. Apr.6, 2004).

■ The one-year statute of limitations under either section 13 of the Securities Act or section 9(e) of the Exchange Act begins to run "when the claim accrued or upon discovery of the facts constituting the alleged fraud . . . . [including] constructive and inquiry notice as well as actual notice." *See Dodds,* 12 F.3d at 350; *see also Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir.2003) (noting that the one-year limitations period under section 9(e) of the Exchange Act "begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge") (internal quotations omitted). Defendants contend that Plaintiffs' claims are time-barred because Plaintiffs' action was commenced more than one year after Plaintiffs were put on actual or constructive (inquiry) notice of the facts underlying the claim. *See id.*

■ A duty to inquire arises when circumstances would suggest to a reasonable investor the probability that she has a cause of action. *Dodds,* 12 F.3d at 350 ("A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of fraud."); *see also Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983) (noting that a plaintiff is put on inquiry notice when the circumstances were "such as to suggest to a person of ordinary intelligence the probability that" the person had been defrauded). Although an investor need not have notice of

the entire fraud or the precise details of the fraud to be on inquiry notice, *Dodds,* 12 F.3d at 351–52, the duty to inquire is not triggered unless plaintiffs were able to perceive the general fraudulent scheme on the basis of available information (including news articles and analysts' reports), *Adams,* 2004 WL 1627313, at *5, and the wrongdoing indicated by that information was "probable, not merely possible," *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir.2003). In moving to dismiss a federal securities lawsuit on statute-of-limitations grounds, defendants bear a heavy burden in establishing that plaintiffs were on inquiry notice. *See Newman,* 335 F.3d at 193 ("Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff . . . should have discovered the fraudulent conduct."). The circumstances giving rise to the duty to inquire are referred to as "storm warnings." *See Levitt,* 340 F.3d at 101; *Dodds,* 12 F.3d at 350.

The determination of whether storm warnings existed is fact-specific, and the sufficiency of storm warnings—i.e., whether circumstances would suggest the probability of fraud to a reasonable investor—depends on the quantity of information available to the plaintiffs and when the fraud allegedly occurred. *See Walther v. Maricopa Int'l Inv. Co.*, No. 97 Civ. 4826(HB), 1998 WL 186736, at *4 (S.D.N.Y. Apr.17, 1998); *see also Dafofin Holdings v. Hotelworks.com, Inc.*, No. 00 Civ. 7861(LAP), 2001 WL 940632, at *3 (S.D.N.Y. Aug.17, 2001) (noting that storm warnings must be sufficient to alert "a reasonable investor with conservative instincts" to the probability of fraud). Investors are not placed on inquiry notice, despite the existence of storm warnings, when "the warning signs [we]re accompanied by reliable words of comfort from management" such that an investor of ordinary intelligence would reasonably have relied on the statements to allay his or her

concern. *LC Capital Partners LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 155 (2d Cir.2003).

■■ After storm warnings give rise to a duty to inquire, knowledge of a cause of action is imputed in two ways, depending on whether the investor undertakes an inquiry once the duty to inquire arises:

> If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose. However, if the investor makes some inquiry once the duty arises, we will impute knowledge of what an investor in the exercise of reasonable diligence should have discovered [concerning the wrongdoing].

*Id.* at 154 (internal citation omitted); *see also Dodds,* 12 F.3d at 350 (noting that once a duty of inquiry arises, "knowledge will be imputed to the investor who does not make such an inquiry"); *Fezzani,* 2004 WL 744594, at *11 ("Once there is a duty to inquire, Plaintiffs' actions dictate the date they are held to have knowledge of the fraud."). A finding that Plaintiffs were placed on inquiry notice is appropriate on a motion to dismiss under Rule 12(b)(6) only if the facts needed to make the deter-

mination can be gleaned from the complaint and related papers. *See LC Capital,* 318 F.3d at 156; *see also Dodds,* 12 F.3d at 352 n. 3.

**1. Inquiry Notice as of May 17, 2001**

Defendants' motion requires a determination as to whether Plaintiffs were on actual or constructive notice of the basis of their claims as of May 17, 2001, one year before the filing of the initial complaint in this action. Because Plaintiffs do not state when they first undertook any actual inquiry, knowledge will be imputed as of the date Plaintiffs' duty to inquire arose. *See LC Capital,* 318 F.3d at 154; *Levitt,* 340 F.3d at 101. Thus, any claim for which Plaintiffs had constructive notice before May 17, 2001 is time-barred.

Plaintiffs' claims involve, in part, Alcatel's allegedly "long overdue need to write-down bloated inventories, overstated goodwill, and the Company's investment in 360networks." (Amended Complaint ¶ 16.) Plaintiffs claim that Alcatel improperly delayed writing down (1) the goodwill associated with its Packet Engines and Xylan acquisitions,[4] (2) excess and obsolete inventory,[5] and (3) Alcatel's investment in

---

4. Plaintiffs allege that almost all of the purchase price of Alcatel's Packet Engines and Xylan acquisitions in 1998 and 1999 was allocated to intangible assets (predominantly "goodwill") on Alcatel's balance sheet, and that the company's financial results were materially overstated during the proposed Class Period because Defendants failed to recognize the impairment of this goodwill—knowing or recklessly disregarding that significant post-acquisition declines in Packet Engines' and Xylan's sales and problems with their technology development materially impaired the ability of the companies to contribute to Alcatel's consolidated revenues—until it filed its 2001 Form 20-F with the SEC on May 1, 2002; that filing disclosed a Q848 million write-down of intangible assets related to the goodwill associated with the acquisitions. (Amended Complaint ¶¶ 54–55, 66.) Plaintiffs allege that the delay in writing down the

goodwill associated with the Packet Engines and Xylan acquisitions violated a GAAP requirement that the reported value of long-term assets be periodically assessed for impairment. (*Id.* ¶¶ 67–71.)

5. Plaintiffs allege that the Q923 million in write-offs taken for excess and obsolete inventory in Alcatel's fiscal year 2001 results and a Q640 million charge taken in the second quarter of 2001 that was partly related to inventory were untimely and violated GAAP because Defendants allegedly knew or recklessly disregarded the inventory buildup as early as November 1999, when an internal study demonstrated the inventory accumulation and need to increase reserves against substantial deterioration in the inventory's market value. (Amended Complaint ¶¶ 75–99.) Plaintiffs allege that "Alcatel went to great lengths to hide the rising inventories ... in preparation for its initial public offering

360networks, all to create the illusion of strong earnings growth despite the telecommunications industry's downturn. Defendants contend that Plaintiffs had inquiry notice of the basis of these particular claims prior to May 17, 2001.

### a. Plaintiffs Were Not on Inquiry Notice of the Basis of Their Claim that Alcatel Failed to Timely Write Down Goodwill Associated with its Packet Engines and Xylan Acquisitions More Than One Year Before Filing the Initial Complaint

Defendants argue that (1) a publicly available complaint (filed September 10, 1999) concerning Packet Engines and Alcatel's 1999 Form 20–F (filed in May 2000), which referenced the litigation; (2) the Prospectus filed October 19, 2000, which noted the "inherent uncertainties" in the process of integrating several newly acquired telecommunications companies, including Packet Engines and Xylan, and warned that "Alcatel cannot guarantee that these operations will be successfully integrated or that the acquisitions will ultimately have a positive impact on its results of operations"; and (3) concerns regarding the Packet Engines and Xylan acquisitions expressed in a July 15, 1999 news report that Packet Engines had "cut staff" together put Plaintiffs on inquiry notice of the basis of their claim that Alcatel improperly delayed writing down the goodwill associated with its Packet Engines and Xylan by allegedly illustrating problems with technology, loss of customers, and lay-offs at the two acquired companies.

■ The pending Packet Engines litigation did not constitute a "storm warning" that Alcatel was going to fail to write down goodwill associated with the acquisition to create the illusion of strong earnings growth despite the telecommunications industry's downturn. For one, the information in the complaint filed in that litigation, which alleges misrepresentations by Alcatel made in acquiring Packet Engines and wrongful termination of the plaintiff employee (the former CEO) of Packet Engines, does not "relate[ ] directly to the misrepresentations and omissions the Plaintiffs [now] allege in their action against the defendants." *See Newman,* 335 F.3d at 193. Further, Alcatel's 1999 Form 20–F stated that "the claims are without merit." An investor of ordinary intelligence would reasonably have relied on these "words of comfort from management" to allay any concern raised by the litigation. *See LC Capital,* 318 F.3d at 155.

■ The language in the Prospectus regarding the "inherent uncertainties" associated with Alcatel's acquisitions also does not constitute a "storm warning" because the warning that Alcatel could not guarantee success is a generic statement applicable to any corporate transaction. *See In re Sterling Foster & Co. Sec. Litig.,* 222 F.Supp.2d 216, 250 (E.D.N.Y.2002) ("To hold otherwise would mean that every statement describing the risks associated with an investment would place potential investors on notice of the probability that they will be defrauded."). The content of the Prospectus advises potential investors that an investment in the securities described involves many risks, but it does not suggest to an investor of ordinary intelligence the probability that he or she has been defrauded. Indeed, the purpose of the "Risks Relating to Alcatel" section of the Prospectus, which contains the language that Defendants argue provided Plaintiffs with inquiry notice, is to advise of such risks. A reasonable investor of ordinary intelligence who read such a pro-

scheduled for July 2001," temporarily removing excess inventory from at least one facility just before investors toured the plant. (*Id.* ¶¶ 96–97.)

spectus would realize the fact that he or she must be able to tolerate financial risk to invest in the securities described, but not the probability of fraud. *See Dodds*, 12 F.3d at 350. As such, the Court finds that the Prospectus itself did not trigger Plaintiffs' duty to inquire.

▮ Likewise, the July 15, 1999 news story does not constitute a "storm warning." Plaintiffs can be put on inquiry notice by a news article. *See In re Ultrafem, Inc. Sec. Litig.*, 91 F.Supp.2d 678, 692 (S.D.N.Y.2000) (examining a news article cited in the complaint and holding that "the article was sufficient to put plaintiffs on notice of the probability of fraud"). But Plaintiffs are not put on inquiry notice simply because news stories discussed Defendant's accounting or other problems. *See In re WorldCom, Inc. Sec. Litig.*, Nos. 02 Civ. 3288(DLC) and 03 Civ. 6592(DLC), 2003 WL 22738546, at *11–12 (S.D.N.Y. Nov. 21, 2003). Plaintiffs are put on notice by a news story only if the content of the article is sufficient to give notice of the probability of fraud. *See In re Ultrafem*, 91 F.Supp.2d at 692. The July 15, 1999 news story in question may have illustrated problems at Packet Engines, but it did not put Plaintiffs on inquiry notice of the basis of their claim that Alcatel improperly delayed writing down the goodwill associated with Packet Engines.

The Court finds that the aforementioned litigation (and its description in Alcatel's Form 20–F), information contained in the Prospectus, and July 15, 1999 news report were not sufficient to put Plaintiffs on inquiry notice of the basis of their claim that Alcatel failed to timely write down goodwill associated with its Packet Engines and Xylan acquisitions more than one year before filing the initial complaint.

Although these harbingers may have alerted Plaintiffs to the possibility of wrongdoing, they did not suggest a probability of fraud.

**b. Plaintiffs Were Not on Inquiry Notice of the Basis of Their Claim that Alcatel Failed to Timely Write Down Excess Inventory More Than One Year Before Filing the Initial Complaint**

▮ Defendants argue that numerous publications and conference calls in late 2000 and early 2001 regarding Alcatel's need to improve its inventory process put Plaintiffs on inquiry notice of the basis of their claim that Alcatel improperly delayed writing down excessive and obsolete inventory. In a conference call with analysts on October 3, 2000, Tchuruk commented that Alcatel "has never been that good in inventories" and "could probably improve inventories by at least 2 billion." (Aff. Robert E. Zimet Supp. Defs.' Mot. Dismiss, Ex. R (transcript of Oct. 21, 2000 Alcatel teleconference (cited in Amended Complaint ¶ 158)), at 19.)[6] In a January 31, 2001 press release, Alcatel reiterated that it "clearly ha[d] more to do ... as far as Inventories are concerned" and announced that it was "implementing [the] previously announced internal project [to] reduce inventories by $2 billion." (*Id.*, Ex. F (Jan. 31, 2001 press release (cited in Amended Complaint ¶ 164)).) Also on January 31, 2001, the front cover of a Merrill Lynch analyst report stated that "Alcatel has historically been vulnerable ... in the area of inventory control." (*Id.*, Ex. H ("Alcatel FY2000 Results," Jan. 31, 2001 (cited in Amended Complaint ¶ 175)).) A February 1, 2001 Morgan Stanley Dean Witter analyst report highlighted Alcatel's

---

**6.** A district court may consider the full text of documents that are partially quoted in a complaint in determining whether to grant a motion to dismiss a securities fraud action. *San*

*Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 809 (2d Cir.1996).

"inventory issues" and stated that "management admits that some of this is due to inefficient internal processes." (*Id.*, Ex. S (cited in Amended Complaint ¶ 161).) Yet none of these events, although indicative of a potential inventory problem, were sufficient storm warnings to indicate to Plaintiffs the probability of a fraudulent failure to write down inventory in a timely fashion. They could not, for example, have alerted investors to what Plaintiffs allege was Alcatel's failure to properly account for said inventory buildup. Plaintiffs were therefore not on inquiry notice of the basis of their claim that Alcatel failed to timely write down excess inventory more than one year before filing the initial complaint.

**c. Plaintiffs Were Not on Inquiry Notice of the Basis of Their Claim that Alcatel Failed to Timely Write Down Its Investment in 360networks More Than One Year Before Filing the Initial Complaint**

 Defendants argue that numerous publications in late 2000 and early 2001 discussing the nature of Alcatel's investment in 360networks put Plaintiffs on inquiry notice of the basis of their claim that Alcatel improperly delayed writing down its investment in the company. A December 2000 news article questioned the wisdom of Alcatel's investment in 360networks; a March 2001 360networks conference call announced that the company had cut spending, and a news article that month reported the same; a May 2001 news article quoted an Alcatel spokesperson as stating that orders for submarine technology were slowing, and that month 360networks announced further spending cuts, cancellation of its trans-pacific cable, and the need to raise working capital. None of these events would have alerted Plaintiffs that Defendants had failed to appropriately write down the 360networks investment. Further, Defendants' efforts to manufacture storm warnings by stitching together snippets of press releases regarding purported bad news about 360networks fails because any possible "warning signs [we]re accompanied by reliable words of comfort from management" such that an investor of ordinary intelligence would reasonably have relied on the statements to allay his or her concern. *See LC Capital*, 318 F.3d at 155. For example, in April 2001, a news report informed investors that Alcatel "[did] not anticipate any major write-offs." (Amended Complaint ¶ 184 (citing *AFX European Focus*, Apr. 26, 2001).) Plaintiffs were therefore not on inquiry notice of the basis of their claim that Alcatel failed to timely write down its investment in 360networks more than one year before filing the initial complaint.

**d. Plaintiffs Were on Inquiry Notice of the Basis of Their Claims as of May 29, 2001**

 Plaintiffs were put on inquiry notice of the underlying facts of the claims alleged in this action as of May 29, 2001, when Alcatel made announcements that Plaintiffs themselves claim revealed Alcatel's allegedly fraudulent scheme. Although there were signs that may have alerted Plaintiffs to the *possibility* of wrongdoing before Alcatel's May 29, 2001 announcements, whatever signs existed did not raise a *probability* of wrongdoing sufficient to put Plaintiffs on inquiry notice of fraud concerning the remainder of Plaintiffs' claims. Thus, the statute of limitations allowed Plaintiffs until May 29, 2002 to file a complaint. The first complaint in this action was filed on May 17, 2002, within the allowable period.

**2. Relation Back**

 The question remains, however, whether the substantive claims and class of plaintiffs that first appear in the No-

vember 18, 2002 Amended Complaint "relate back" for statute-of-limitations purposes under Federal Rule of Civil Procedure 15(c) to the date that the original timely complaint was filed. Rule 15(c)(2) provides that claims in an amended pleading relate back to the date of the original timely pleading when those claims "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c)(2); *see also In re American Express Sec. Litig.,* No. 02 Civ. 5533(WHP), 2004 WL 632750, at *7 (S.D.N.Y. Mar.31, 2004) (noting that an amended pleading does not relate back if it introduces a new set of operative facts). The "central inquiry" under Rule 15(c)(2) "is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 86 (2d Cir.1999) (citation omitted).

█ The general fact situation in the original complaint centers on the October 20, 2000 Optronics IPO. The original complaint alleges that Defendants are liable for omissions and misstatements of material fact in the IPO Prospectus and Registration Statement and in post-offering press releases. That complaint addresses material changes to Alcatel's business before the IPO, including an alleged buildup of obsolete inventory and the downturn in demand for Alcatel's optical network technologies. The original complaint does not, however, allege that Alcatel's alleged misstatements in its prospectus and results were meant to further its acquisition campaign to establish a substantial North American presence (the overall "scheme" alleged in the Amended Complaint). Nor does it allege that there were problems with the Packet Engines and Xylan acquisitions and any improper accounting for

"goodwill" associated with those. Plaintiffs assert that new claims made in the Amended Complaint, which are based on many additional alleged misstatements, relate back because "Plaintiffs have merely amplified the original claims, adding new misstatements made in furtherance of that same alleged scheme." (Pls.' Mem. Opp'n Mot. Dismiss at 30.) Plaintiffs argue that they have alleged the "same basic wrongs" simply by alleging violations of the "same sections of the same statutes." (*Id.*) The Court disagrees.

The Court finds that Plaintiffs did not give Defendants adequate notice in their original timely complaint that they intended to bring suit on their substantive claims concerning problems with the Packet Engines and Xylan acquisitions and any improper accounting for "goodwill" associated with those acquisitions. Plaintiffs have not pointed to any language in the initial complaints that would have provided the notice required for these claims, which first appeared in the November 18, 2002 Amended Complaint, to relate back to the original timely pleading for statute-of-limitations purposes. *See In re Worldcom, Inc. Sec. Litig.,* 308 F.Supp.2d 214, 232 (S.D.N.Y.2004) (holding that claims did not relate back where plaintiffs failed to point to language in the original complaints that would have provided notice where original complaints were based on a separate transaction unrelated to the new claim). Although Plaintiffs' claims relating to the Packet Engines and Xylan acquisitions were not barred for failure to timely inquire, these claims do not "relate back" for statute-of-limitations purposes and are therefore dismissed as time-barred on that ground.

The Court finds that Plaintiffs gave Defendants adequate notice in their original timely complaint that they intended to bring suit on the remainder of their sub-

stantive claims. Documents relating to the timely claims that are referenced in the Amended Complaint, but not in the initial complaint, also relate back to the extent that they relate to the same "conduct and transactions" in the initial complaint. *See In re American Express,* 2004 WL 632750, at *9 (noting that documents first mentioned in an amended complaint relate back when they "relate to the same 'conduct and transactions' discussed in the original complaint" (quoting *Stevelman,* 174 F.3d at 87) and contrasting *In re Bausch & Lomb, Inc. Sec. Litig.,* 941 F.Supp. 1352, 1366 (W.D.N.Y.1996), which held that a press release referenced solely in the amended complaint "constituted a separate alleged act of fraud" and did not relate back, on the ground that the initial pleading in *In re Bausch & Lomb* "gave no indication that plaintiffs were alleging fraud for the period during which the press release was issued").

■ The Court finds that the class of Plaintiffs first appearing in the November 18, 2002 Amended Complaint (those who purchased Class A ADS between May 1, 2000 and October 20, 2000) does not "relate back" for statute-of-limitations purposes and is therefore time-barred and dismissed. Nothing in the initial complaint put Defendants on notice that they would be subject to claims for stock purchases before the October 20, 2000 Optronics IPO. Indeed, the class in the first complaint was explicitly tied to the IPO. Because the claims of the newly added plaintiffs were brought more than one year after May 29, 2001, their claims are time-barred. The Plaintiffs that remain are those who purchased Class O ADS related to the October 20, 2000 IPO or Class O and A ADS between the IPO and May 29, 2001.

Accordingly, the motion to dismiss for failure to comply with the statute of limitations is granted as to (1) Plaintiffs' claims concerning problems with the Packet Engines and Xylan acquisitions and any improper accounting for "goodwill" associated with those acquisitions for failure to relate back and (2) the class of Plaintiffs who purchased Class A ADS between May 1, 2000 and October 20, 2000. The motion to dismiss for failure to comply with the statute of limitations is denied as to the remainder of Plaintiff's claims.

**C. Plaintiffs' Securities Act Claims**

**1. Sections 11 and 12(a)(2)**

■ Plaintiffs allege that Defendants violated section 11 of the Securities Act—which provides that any signer of a registration statement, director of the issuer, preparing or certifying accountant, or underwriter of a security may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading," 15 U.S.C. § 77k(a)—with regard to the Registration Statement for the October 20, 2000 IPO of Class O ADS.[7] Section 11 "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82,

---

7. Of course, only those Plaintiffs who purchased Class O shares pursuant or traceable to the IPO have standing to bring this section 11 claim. *See Salomon Smith Barney v. Asset Securitization Corp.,* No. 98 Civ. 4186(BSJ), 1999 WL 1095605, at *3 (S.D.N.Y. Dec.3,

1999) ("[S]econdary market purchasers are protected against defects in the registration by [section 11 of the Securities Act], provided only that they can trace their security to the registered offering.").

103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Plaintiffs also allege that Defendants violated section 12(a)(2) of the Securities Act, which allows a purchaser of a security to bring a private action against a seller that "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading." 15 U.S.C. § 77*l*(a)(2).[8] Defendants argue that Plaintiffs fail to state a claim upon which relief can be granted under either section 11 or section 12(a)(2) such that Counts One and Two of the Amended Complaint should be dismissed in accordance with Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

■ Plaintiffs' section 11 and section 12(a)(2) claims are premised on averments of fraud and are therefore subject to the particularity requirements of Rule 9(b). *See Rombach v. Chang*, 355 F.3d 164, 166, 170–71 (2d Cir.2004) (noting that the heightened pleading standard of Rule 9(b) applies to claims brought under section 11 or section 12(a)(2) of the Securities Act when those claims sound in fraud). Plaintiffs' complaint charges Defendants with a fraudulent scheme whereby they engaged in accounting "improprieties" specifically to inflate Alcatel's financial results to continue a "business acquisition campaign." (Amended Complaint ¶ 7; *see also id.* ¶¶ 9, 38, 103, 133, 205, 207 (using the terms "fraud" and "scheme" to describe Defendants' actions).) Indeed, Plaintiffs argue that the IPO itself (the basis of Plaintiffs' Securities Act claims) was an integral part of this scheme because it "raise[d] capital and created an additional stock currency to aid the Company's acquisition strategy." (*Id.* ¶ 10; *see also id.* ¶¶ 11, 110 (alleging the use of "O shares to lure acquisition targets").) Further, Plaintiffs fail to specify the basis for any negligence claim (i.e., duty, breach, and damage resulting proximately therefrom) in their Amended Complaint or in their opposition to Defendants' motion to dismiss; and the Court refuses to parse their allegations to construct a negligence claim on their behalf. *See Rombach*, 355 F.3d at 176 (noting that a court is not required to sift through fraud allegations in search of a lesser included claim). The allegations that Plaintiffs make here are "classic fraud allegations, that is, allegations of misrepresentations and omissions made with intent to defraud upon which plaintiffs relied." *See In re Ultrafem*, 91 F.Supp.2d at 691. Plaintiffs' boilerplate disclaimers that their allegations are incorporated into their claims under sections 11 and 12(a)(2) "except to the extent any such allegation may be deemed to sound in fraud" (Amended Complaint ¶¶ 215, 225) is insufficient to remove those allegations from the requirements of Rule 9(b). *See In re Ultrafem*, 91 F.Supp.2d at 690 (holding that disclaimers that allegations are incorporated into Securities Act claims "except to the extent" that they "sound in fraud" do not suffice to avoid the requirements of Rule 9(b) when Plaintiffs allege a fraudulent scheme).

■ Under Rule 9(b), the circumstances constituting fraud must be stated with particularity, meaning that such allegations must "(1) specify the statements that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where

---

8. Only those Plaintiffs who purchased Class O shares pursuant to (i.e., in) the IPO have standing to bring this section 12(a)(2) claim. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (limiting section 12(a)(2)'s scope to registered public offerings); *In re Ultrafem*, 91 F.Supp.2d at 693 ("Purchasers in private or secondary market offerings do not have standing to bring actions under Section 12[ (a) ](2).")

and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000) (citation and internal quotation marks omitted); *see also* Fed. R.Civ.P. 9(b); *Rombach,* 355 F.3d at 170 (setting out the same four pleading requirements for section 11 and section 12 claims that sound in fraud).

## 2. The Registration Statement and Incorporated Documents

Plaintiffs allege that the IPO Registration Statement, including the Prospectus filed with it, omitted material information regarding "trends and uncertainties" and material changes to Alcatel's business. (Amended Complaint ¶¶ 148, 150.) Plaintiffs do not point to a single affirmative statement in the Registration Statement itself that is rendered misleading by such purported omissions, but do point to language in the Prospectus and Alcatel's 1999 Annual Report as violating the Securities Act.

 Plaintiffs point to the following section of the Prospectus as constituting a materially false and misleading statement that violates both section 11 (as incorporated into the Registration Statement) and section 12(a)(2):

The Optronics division believes that it is well positioned within the opto-electronics industry to take advantage of significant growth opportunities because of its key competitive strengths, which are:

- Technological leadership in active optical components
- In-depth telecom systems knowledge
- Ability to integrate multiple optical functions inside a single unit
- Proven experience in the metro segment, which is the part of the telecommunications network that carries regional and local traffic
- Close relationships with customers
- Quick response time to customers' needs

The Optronics division intends to use its competitive strengths to further develop its leading position as an integrated supplier of optical chips, modules and subsystems worldwide through the following strategies:

- Focusing on high-end, profitable products for the fastest growing market segments
- Developing technologies for combining active and passive components together into integrated sales models
- Promoting sales of all product lines to outside customers
- Pursuing strategic acquisition opportunities

(Prospectus at 5 ("Prospectus Statement") (cited in Amended Complaint ¶ 147).) Plaintiffs' Amended Complaint, referencing this Prospectus Statement, adequately specifies the allegedly fraudulent statements and identifies the speaker, place, and time of the statements in accordance with Rule 9(b). To fully meet the requirements of Rule 9(b), however, Plaintiffs must also explain why these statements were fraudulent. *See Novak,* 216 F.3d at 306.

 Plaintiffs claim that this Prospectus Statement was materially false and misleading because it "represented that demand for Optronics Division products was great, that demand would continue to increase, and that the Optronics Division was well positioned within the opto-electronics industry to take advantage of growth opportunities," (Amended Complaint ¶ 147), despite "a material decline in demand for [Alcatel's] products ... [that] the value of Alcatel's assets were materially overstated ... [and] the financial results contained in the Prospectus ... were not prepared in conformity with GAAP" (*id.* ¶ 148). But Plaintiffs' allegations of

fraud, which relate to Alcatel in general, and the Prospectus Statement, which addresses the Optronics Division specifically, do not connect with sufficient particularity to meet the Rule 9(b) pleading requirements for the Prospectus Statement with this explanation of why they believe the Prospectus Statement was fraudulent. In addition to this disconnect, "the presence of an affirmative statement that is made misleading by the material omission" is a "threshold requirement" under section 11, and a pleading that sets forth only vague assertions that a false and misleading impression was created by alleged omissions is not sufficient. *In re Union Carbide Class Action Sec. Litig.*, 648 F.Supp. 1322, 1326 (S.D.N.Y.1986).

■■■ Plaintiffs allege that the following language in Alcatel's 1999 Annual Report on Form 20–F, filed with the SEC on May 1, 2000 and incorporated by reference into the Registration Statement, violates section 11:

> Alcatel's income from operations increased by 23.8% to 1.3 billion in 1999, compared with 1.0 billion in 1998. The increase in income from operations was due principally to the growth in the Networking segment, which increased by 56.8%, the Enterprise and Consumer segment, which improved from (69) million in 1998 to 39 million in 1999 and the Telecom Components segment, which increased by 10.7%. Together, these increases offset the cost of the 34% increase in research and development expenses incurred by the Internet and Optics segment and the negative environment in high voltage cables experienced by the Energy Cables seg-

ment, for which income from operations decreased by 22%. Alcatel's operating margin (income from operations divided by net sales) increased to 5.5% in 1999, compared with 4.8% in 1998. Gross margin increased to 28.8% in 1999, compared with 27.4% in 1998. This increase was due primarily to the 8.3% increase in net sales and productivity gains....Alcatel's net income amounted to $644 million in 1999, compared with $2.3 billion in 1998.

(Amended Complaint ¶ 134 (quoting Alcatel's 1999 Annual Report on Form 20–F ("Annual Report Statement")).) [9] Plaintiffs' Amended Complaint, referencing the Annual Report Statement, adequately specifies the allegedly fraudulent statements and identifies the speaker, place, and time of the statements in accordance with Rule 9(b). (*See id.*)

Plaintiffs fail to fully meet the requirements of Rule 9(b), however, because they do not adequately explain why the Annual Report Statement was fraudulent. *See Novak*, 216 F.3d at 306. Plaintiffs allege that the Annual Report Statement was materially false and misleading when made, and made without a reasonable basis, because it misrepresented or omitted that "Alcatel had experienced a material decline in the demand for the Company's products beginning in 1999 ...; defendants knew or recklessly disregarded that beginning as early as 1998, levels of excess and obsolete inventory were rapidly rising within Alcatel necessitating a write-down ...; and defendants failed to disclose that fiscal year 1999 results were met only because they engaged in ... GAAP violations." (Amended Complaint ¶ 137.)

---

**9.** Plaintiffs also allege that statements in the Annual Report and Amendment No. 1 to the Report (filed with the SEC on October 12, 2000) referencing the Xylan and Packet Engines acquisitions and Alcatel's alleged failure to write down goodwill associated with those companies violate section 11. (*See* Amended Complaint ¶¶ 134–35.) Plaintiffs' substantive claims concerning problems with the Packet Engines and Xylan acquisitions have already been dismissed as time-barred, however, and the Court will not address them further.

Plaintiffs' general allegations of declining demand, failure to write down excess inventory, and GAAP violations do link up to language in the Annual Report Statement in such a way as to explain why the Annual Report Statement is fraudulent.

Plaintiffs Securities Act claims based on the Prospectus and Alcatel's 1999 Annual Report as incorporated into the Registration Statement are dismissed for failure to plead fraud with sufficient particularity in accordance with Rule 9(b).

### 3. Section 15

Plaintiffs allege that Tchuruk and Halbron are liable as controlling persons of Alcatel under section 15 of the Securities Act, which provides that "[e]very person who ... controls any person liable under [section 11 or 12 of the Securities Act] shall also be liable jointly and severally with and to the same extent as such controlled." 15 U.S.C. § 77o. There can be no secondary liability under section 15 unless a primary violation has been properly pled under section 11 or section 12. *In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*, No. 95 Civ. 0330(LMM), 1996 WL 551732, at *11 (S.D.N.Y. Sept.27, 1996). Because the Court has dismissed Plaintiffs' primary claims under sections 11 and 12 of the Securities Act, Plaintiffs' section 15 claims against Tchuruk and Halbron are likewise dismissed.

### D. Plaintiffs' Exchange Act Claims

### 1. Section 10(b) and Rule 10b–5

Plaintiffs allege that Defendants violated section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ...

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The fundamental purpose of the federal securities laws "was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Section 10(b) in particular is "designed to protect investors by serving as a 'catchall provision' which prohibits manipulative practices by defendants acting in bad faith." *In re Rediff.Com*, 2004 WL 2320364, at *10 (citing *Hochfelder*, 425 U.S. at 206, 96 S.Ct. 1375).

■ To state a prima facie case for securities fraud under these provisions, a plaintiff must plead that, in connection with the purchase or sale of securities, (1) a defendant made a false representation of material fact or omitted to disclose material information that the defendant had a duty to disclose; (2) that defendant acted with scienter; and (3) the plaintiff's reliance on that defendant's action caused the plaintiff injury. *Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000); *In re American Express Co. Sec. Litig.*, No. 02 Civ. 5533(WHP), 2004 WL 632750, at *4 (S.D.N.Y. Mar.31, 2004).

A plaintiff who alleges securities fraud under section 10(b) and Rule 10(b)(5) must also satisfy the heightened pleading standards of the PSLRA and Rule 9(b). *See* PSLRA 15 U.S.C. § 78u–4(b)(1) ("[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed."); *id.* § 78u–4(b)(2) (requiring plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind"); Fed.R.Civ.P. 9(b); *Novak*, 216 F.3d at 306 (noting that such a complaint must "(1) specify the statements that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent" in accordance with Rule 9(b)).

**2. Plaintiffs' Exchange Act Claims as Set Forth in the Amended Complaint**

■ Plaintiffs allege that Defendants made two categories of misleading statements and omissions. First, Plaintiffs claim that Alcatel's assets, stockholders' equity, earnings, and earnings per share were materially inflated by means of improper accounting practices. Second, Plaintiffs allege that Defendants made materially false and misleading statements or omissions (in SEC filings, press releases, conference calls, analysts' reports, and newspaper and magazine articles) concerning declining demand for Alcatel's optical products and increasing levels of unusable or obsolete inventory. Plaintiffs' allegations fail to satisfy the first element of securities fraud under the heightened fraud-pleading requirement because, although they make many general allegations, Plaintiffs fail to set forth specific, false statements or misleading omissions of material fact that are accompanied with identification of the speaker, time, and place of each statement and an explanation of why each statement is fraudulent. *See* PSLRA 15 U.S.C. § 78u–4(b)(1); Fed. R.Civ.P. 9(b); *Suez Equity Investors*, 250 F.3d at 95.

Although Plaintiffs' 250–paragraph, 102–page Amended Complaint is long, it states very little with particularity. Plaintiffs list various statements—often setting forth lengthy quotations from various releases by Defendants' officers and securities analysts—then follow each with a similar (in most cases identical) laundry list of "specific" reasons why the statements are allegedly false. (*See* Amended Complaint ¶¶ 139, 142, 153, 172, 183.) Plaintiffs neglect to make it clear what portion of each quotation constitutes a false representation, or which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts. This method is deficient under the pleading standards. *See Endovasc Ltd., Inc. v. J.P. Turner & Co.*, No. 02 Civ. 7313(LAP), 2004 WL 634171, at *6, *9 (S.D.N.Y.

Mar.30, 2004) (dismissing a plaintiff's complaint where the plaintiff "provided a laundry list of alleged false statements," but supported the alleged misstatements "only by sweeping, conclusory allegations that lack[ed] particularity as to how the statements were untrue"); *see also In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 991 (D.Ariz.1999) (critiquing complaint for "recit[ing] the same allegations for every advance press release and subsequent SEC filing during the class period, with little differentiation" and "remind[ing] plaintiffs that the heightened pleading rules are designed to elicit clarity, not volume ... [and that] court[s] should not have to play connect-the-dots in order to identify the facts and trends upon which plaintiffs base their claim"). Plaintiffs' section 10(b) and Rule 10(b)(5) claims are dismissed for failure to plead with sufficient particularity.

### 3. Control Person Liability: Section 20(a)

Plaintiffs allege that Defendants violated section 20(a) of the Exchange Act, which provides that any person who "controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable." 15 U.S.C. § 78t(a). To state a claim for control-person liability under this section against Tchuruk or Halbron, the Amended Complaint must allege (1) a primary violation by Alcatel (as a "controlled person"), (2) control of Alcatel by the individually named Defendant; and (3) that the individually named Defendant was "in some meaningful sense a culpable participant" in the primary fraud violation. *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998). Because Plaintiffs have failed to adequately plead a primary violation under section 10(b) or Rule 10b–5, Plaintiffs' claims under section 20(a) for "control-person liability" must likewise be dis-

missed. *See In re American Express*, 2004 WL 632750, at *4 n. 16.

### E. Leave to Replead and Dismissal with Prejudice

The decision whether to grant Plaintiffs leave to replead any claims dismissed by the Court rests "within the sound discretion of the court," *American Stock Exch., LLC v. Mopex, Inc.*, 230 F.Supp.2d 333, 335 (S.D.N.Y.2002), and leave to amend "shall be freely given" in the absence of countervailing factors such as undue delay, bad faith or dilatory motive, undue prejudice to the opposing party, or futility of the amendment, *see* Fed. R.Civ.P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). None of the countervailing factors is present to prevent the Court from granting Plaintiffs leave to replead the Securities Act and Exchange Act claims that the Court dismisses for failure to plead fraud with sufficient particularity. Plaintiffs are therefore granted leave to replead those claims.

The Court dismisses with prejudice those of Plaintiffs' claims for which "it would be futile to grant leave to replead," however, and Plaintiffs may not replead those claims. *See Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also Nerney v. Valente & Sons Repair Shop*, 66 F.3d 25, 28 (2d Cir.1995) (noting that futility of an amendment is a valid reason for a district court to deny leave to amend). The Court finds that it would be futile for Plaintiffs to replead those claims that the Court dismisses as time-barred, and those claims are therefore dismissed with prejudice.

### III. CONCLUSION

For the aforementioned reasons, Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. The effect

of this decision is to dismiss Plaintiffs' Amended Complaint in its entirety. To summarize, (1) Plaintiffs' action is dismissed in its entirety as against Daniel Bernard, Phillippe Bissara, Frank Biount, Paolo Fresco, Jacques Friedman, Noel Goutard, Pierre–Louis Lions, Thierry de Loppinot, Jean–Marie Messier, Bruno Vaillant, Marc Vienot, Helmut Werner, Jozef Cornu, Pascal Durand–Barthez, Morgan Stanley & Co. International Ltd., Societe Generale, Credit Suisse First Boston (Europe) Ltd., Merrill Lynch International, Credit Agricole Indosuez Lazard Capital Markets, J.P. Morgan Securities Ltd., and Lehman Brothers International (Europe); (2) Plaintiffs' substantive claims concerning problems with the Packet Engines and Xylan acquisitions and alleged improper accounting for "goodwill" associated with those acquisitions are dismissed with prejudice as time-barred for failure to relate back to the original timely complaint; (3) the class of plaintiffs who purchased Class A ADS between May 1, 2000 and October 20, 2000 is dismissed with prejudice as time-barred for failure to relate back to the original timely complaint; (4) Plaintiffs' Securities Act claims (Counts One, Two, and Three) are dismissed for failure to plead fraud with sufficient particularity; and (5) Plaintiffs' Exchange Act claims (Counts Four and Five) are dismissed for failure to plead with sufficient particularity. Remaining Plaintiffs have thirty days from the date that this decision is entered to file a Second Consolidated Amended Complaint. A status conference is hereby scheduled for Friday, April 15, 2005 at 9:30 AM in Courtroom 14C.

**So Ordered.**